CITY OF MEMPHIS et al. v. ST. LOUIS & S. F. R. CO.

(Circuit Court of Appeals, Sixth Circuit.   November 17, 1910.)

No. 1,928.

1. COURTS (§ 405*)—FEDERAL COURTS—ASSIGNMENTS OF ERROR.
   Even when the assignments of error in the Circuit Court of Appeals are insufficient, this does not of itself constitute ground compelling the dismissal of an appeal, as the court may nevertheless, under the proviso contained in rule 11 (150 Fed. xvii, 79 C. C. A. xvii), notice a plain error not assigned.

   [Ed. Note.—For other cases. see Courts, Dec. Dig. § 405.*]

2. RAILROADS (§ 75*)—RIGHT TO CONSTRUCT AND OPERATE—LEGISLATIVE GRANT
   —TENNESSEE STATUTE—"MANUFACTURING PLANT."
   Acts Tenn. 1903, c. 110, § 1, granting authority to any company operating a railroad in the state to build lateral roads not exceeding 15 miles in length, extending from the main stem or any branch of its line "to any mill, quarry, mine, manufacturing plant or to the bank of any navigable stream, without the making of any amendment to the charter of said railroad," does not confer the right on a railroad company to the exclusion of the municipal authorities to build a branch track within the limits of a city to a connection with the private tracks of a cotton compress company a quarter of a mile from a river, the compress being 500 feet from the river and having no track connection therewith, on the ground that it is a lateral road to the bank of a "navigable stream," nor on the ground that the compress is a "manufacturing plant," within the meaning of the statute: it not being such a plant within any just or recognized definition of the term.

   [Ed. Note.—For other cases, see Railroads, Cent. Dig. § 184; Dec. Dig. § 75.*]

3. RAILROADS (§ 75*)—RIGHT TO CONSTRUCT AND OPERATE—LEGISLATIVE GRANT
   —TENNESSEE STATUTE—"TERMINAL FACILITY"—"TURNOUT"—"SWITCH."
   Neither is such a track a terminal facility or a turnout or switch within the meaning of Acts Tenn. 1903, c. 216, authorizing the construction of such tracks.

   [Ed. Note.—For other cases, see Railroads, Dec. Dig. § 75.*

   For other definitions, see Words and Phrases, vol. 8, pp. 6841–6842; vol. 8, p. 7138.]

4. RAILROADS (§ 75*)—RIGHT TO CONSTRUCT AND OPERATE—MUNICIPAL GRANT.
   Under the provisions of the charter of the city of Memphis giving it entire control over all the city streets and power "to permit and regulate the laying off of railroad tracks and iron and the passage of railroad cars," vesting in the city council charge and control of the granting of all franchises and special privileges, and providing that "no franchise shall be granted or sold to any commercial railroad * * * or other quasi public corporation except by ordinance fully guarding and protecting the rights of the public," in the absence of direct legislative authority, a railroad company has no right or authority to build or maintain a track within the city and over its streets without the consent of the council, and where the council has granted such right by an ordinance, subject to certain conditions, one of which is that the company shall file a written acceptance of its provisions. such ordinance is an entirety, and its acceptance is a condition precedent to the grant.

   [Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 183–191; Dec. Dig. § 75.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

183 F.—34

5. RAILROADS (§ 49*)—"TURNOUT"—"SWITCH."
  The words "turnouts" and "switches," in Acts Tenn. 1903, c. 216, providing that any railroad company may build turnouts and switches without altering its charter, relate to tracks in the nature of side tracks adjacent to and used in connection with another line of track, and do not refer to a track which branches off entirely from the existing line to a distant objective point.
  [Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 110–112; Dec. Dig. § 49.*]

Appeal from the Circuit Court of the United States for the Western District of Tennessee.

Suit in equity by the St. Louis & San Francisco Railroad Company against the City of Memphis and George T. O'Haver, its Chief of Police. Decree for complainant, and defendants appeal. Reversed.

C. M. Bryan, City Atty., and T. K. Riddick (Jas. L. McRee, of counsel), for appellants.

E. E. Wright and C. W. Metcalf, for appellee.

Before WARRINGTON and KNAPPEN, Circuit Judges, and SANFORD, District Judge.

SANFORD, District Judge. This is a bill filed by the St. Louis & San Francisco Railroad Company, a Missouri corporation, the complainant below, against the city of Memphis, a municipal corporation of Tennessee, and George T. O'Haver, its chief of police, the defendants below, for the purpose of enjoining the defendants from interfering with the complainant in the construction and use of a lateral track in the city of Memphis.

A restraining order was granted under the bill and later a preliminary injunction. At the final hearing, a decree was rendered in which the court found, in general terms, that there was equity in the bill, and that the complainant was entitled to relief as therein prayed, and therefore ordered, adjudged, and decreed that the defendants be perpetually enjoined and restrained from interfering with the construction or reconstruction of the track in question, and from interfering in any manner with the quiet and peaceable use of such track for railroad purposes, and taxed the costs of the cause against the defendants. The defendants appealed to this court, filing an assignment of errors in substance as follows: (1) That the court erred in holding in its final decree that the complainant was entitled to an injunction and in perpetually enjoining and restraining the defendants from interfering with the construction and use of the complainant's track; (2) that the court erred in granting a preliminary injunction; and (3) that the court erred in adjudging the costs against the defendants.

The appellee as a preliminary matter has moved to dismiss the appeal because of the failure of the appellants to file sufficient assignments of error as prescribed by rule 11 of this court. This rule provides that the appellant shall file with his petition for appeal "an assignment of errors, which shall set out separately and particularly each error asserted and intended to be urged," and that "errors not assigned according to this rule will be disregarded, but the court, at

its option, may notice a plain error not assigned." 150 Fed. xxvii, 79 C. C. A. xxvii.

We are of the opinion that the motion to dismiss is not well taken. It appears to be true that under the decisions of this court in Deering Harvester Co. v. Kelley. 103 Fed. 261, 43 C. C. A. 225, The Myrtie M. Ross, 160 Fed. 19, 87 C. C. A. 175, and Garrett v. Pope Motor Car Co., 168 Fed. 905, 94 C. C. A. 334, involving the sufficiency of general assignments of error to final decrees and judgments, and other decisions of this court and of the Circuit Courts of Appeals of other circuits therein cited, the assignments of error filed in this case, in so far at least as they relate to the final decree in the court below, are too vague and indefinite to comply with the requirements of rule 11. Whether under the rule stated in Doan v. American Book Co. (7th Circuit) 105 Fed. 772, 45 C. C. A. 42, the second assignment of error, relating to the granting of the preliminary injunction, is also insufficient, need not now be determined, since we are of the opinion that, even where the assignments of error are insufficient, this does not of itself constitute ground compelling the dismissal of an appeal, as the court may nevertheless, under the proviso contained in rule 11, notice a plain error not assigned. This has been held in two cases involving the effect of a similar rule of the Supreme Court, in which motions to dismiss writs of error and appeals were denied, although no assignments of error had been filed. School District of Ackley v. Hall, 106 U. S. 428, 1 Sup. Ct. 117, 27 L. Ed. 237; United States v. Pena, 175 U. S. 500, 502, 20 Sup. Ct. 165, 44 L. Ed. 251. Hence, where sufficient assignment of errors have not been filed, the real question is whether the court shall determine, in the exercise of its option, to notice a plain error not assigned, or, on the other hand, if no error appears of which the court deems itself warranted in taking notice, the judgment or decree below shall be affirmed for want of sufficient assignment of errors, in accordance with the practice followed in Garrett v. Pope Motor Car Co., supra, and other cases.

We accordingly overrule the motion to dismiss the appeal, and proceed to examine the record for the purpose of determining whether it presents any plain error "of a controlling character" of which the court would be warranted in taking notice, under the rule laid down by this court in Mast & Co. v. Drill Co., 154 Fed. 45, 51, 83 C. C. A. 157.

The material facts essential to a determination of the legal questions involved are substantially these:

The complainant, the St. Louis & San Francisco Railroad Company, hereinafter designated as the Railroad Company, is a railroad corporation, organized under the laws of the state of Missouri, and engaged in operating an interstate railroad line about 4,000 miles in length. For many years it has operated about 12 miles of this line within the state of Tennessee. This portion of its line enters the city of Memphis from the west over a bridge across the Mississippi river, and extends in a southeasterly direction through the city, across the southwestern corner of the state of Tennessee, into the state of Mississippi. It has also had for some years another track, known as the

incline track, which branches off from this main line a short distance east of the end of the bridge, and extends southwestwardly on an incline to the river bank at a point where the Railroad Company used a ferry boat for crossing the river before the bridge was built.

How the Railroad Company acquired the right to construct and operate these lines in Tennessee does not appear. It is neither alleged nor proven that it has ever complied with the provisions of the Tennessee statutes prescribing the terms and conditions upon which a corporation organized under the laws of another state may carry on in Tennessee the business authorized by its charter (Shannon's Tenn. Code, § 2545 et seq.), nor that it built any portion of these tracks under the provisions of the Tennessee statute authorizing any railroad company created by the laws of any other state to extend its railroad into Tennessee a distance of not exceeding five miles for the purpose of reaching a terminal point or a general or union depot (Tenn. Acts of 1887, c. 160, § 1; Shannon's Code, § 1874); nor is it either alleged or proven that under its charter it is or was authorized or empowered to construct or ꞏerate either its original lines of track in Tennessee, or the additional track now in dispute.

In the year 1907 the complainant Railroad Company (together with another railroad company which is not a party to this suit and whose participation in the matters to be hereinafter referred to, being immaterial to the present issues, will be disregarded in the statement of the facts) entered into negotiations with an industrial corporation, styled the Gulf Compress Company, looking to the establishment by the latter company of a warehouse and cotton compress plant in the city of Memphis, and an extension of the Railroad Company's tracks to reach such plant. It was finally determined to locate this plant upon a tract of land of about 40 acres in the southwest corner of the city, lying upon the east bank of the river, about ¾ of a mile south of the above-mentioned incline track, and extending on the east to Riverside Boulevard, a city street which is also known as Livermore avenue, and which will be hereinafter designated by that name. One of the reasons for selecting this tract of land was that the Compress Company expected to be able by constructing a lift to the bank of the river to obtain also the benefit of river transportation for cotton.

Surveys were made to determine a route for reaching this plant with the railroad tracks. And, while it was possible to reach this plant by a line wholly outside the city, this was deemed impracticable on account of the large cost of the rights of way, and a route was finally selected for the Railroad Company's track, commencing at a point on the incline track above mentioned, west of its connection with the main line, and extending in a southwesterly direction to the eastern boundary of the tract of land on which it was proposed to erect the compress plant. The proposed line of this railroad track was altogether about 2,000 feet in length, and extended through a sparsely settled portion of the city, consisting mainly of unused fields, and crossing two comparatively deep ravines. It crossed several streets of the city, only one of which, however, had been ever opened and used, and this one had never been graded or paved.

As a result of these negotiations the Compress Company and the Railroad Company in May, 1907, entered into a contract by which the Compress Company agreed to acquire the tract of land above mentioned, to erect and maintain thereon warehouses and compress plants for the storage, handling and compressing of cotton, and also to construct on said property sufficient spur tracks extending to the eastern boundary of its property at the western line of Livermore avenue, over which the Railroad Company should have the right to operate its cars for delivering, transporting, and handling cotton covered by the agreement. And on its part the Railroad Company agreed to designate and use the warehouses of the Compress Company, subject to certain exceptions not here material, as its exclusive public station and warehouse for cotton, and to secure the right of way for and to construct and maintain a track extending from its above-mentioned incline track southwestwardly to points of connection at the west line of Livermore avenue with the spur tracks of the Compress Company. This contract, however, did not give the Railroad Company the right to use the spur tracks of the Compress Company for the purpose of handling any other freight than cotton covered by the agreement, which, so far as its terms disclosed, related only to cotton to be transported to or from the Compress Company's plant over the track of the Railroad Company; nor did it provide for any extension of the spur tracks of the Compress Company to the river, by means of a lift or otherwise, or give the Railroad Company any right to use the Compress Company's property, or any spur tracks thereon, for the purpose of making a river connection in any way.

It does appear, however, that the original outlay on the part of the Compress Company contemplated a river connection and lift, for which plans and specifications were made before the property was purchased, showing the method by which it was expected to get cotton to and from the boats on the river, and that this was understood by the Railroad Company; that the officials of the Compress Company and Railroad Company have discussed the advisability of also taking on logs at the proposed lift and loading them on the railroad cars at the compress, allowing the Railroad Company the free use of the Compress Company's tracks for that purpose; and, that, while no formal contract has been entered into, the understanding was that the Compress Company would co-operate with the Railroad Company in developing its business and using the lift for raising logs or lumber to be loaded on the railroad cars; and, further, that while nothing was originally discussed in this connection except cotton, lumber, and logs, since this suit was brought there have been negotiations between the Compress Company and the Railroad Company looking to the handling of other freight.

It does not appear, however, when the Compress Company expects to construct the lift from the river, or that it is under any actual contract obligation with the Railroad Company to construct such lift, or to permit the use thereof by the Railroad Company for any purpose whatsoever.

After the execution of the above-mentioned contract the Compress

Company proceeded, at great expense, to erect its plant upon the above-mentioned tract of land, and has constructed thereon the spur tracks called for in the contract, which commence at the western line of Livermore avenue, about a quarter of a mile from the river bank, and extend westwardly along its various warehouses and compresses, terminating some 400 or 500 feet from the river bank. The termination of these spur tracks is from 50 to 100 feet above the river level, and is separated from the river bank by very rough ground, covered with timber and an intervening bluff. No connection whatever has been made between these spur tracks and the river, and it is now impossible to receive or deliver cotton or other freight to or from the river.

In June, 1907, after the execution of the above-mentioned contract between the Compress Company and the Railroad Company, the Railroad Company presented its petition to the Memphis city council, stating that it desired to construct an additional track in the city for the purpose of reaching a new compress that was to be erected on the bank of the river west of Livermore avenue, and praying that it be granted permission to cross said avenue and the other intervening avenues with the tracks, and also presented therewith the draft of an ordinance granting it the right to construct and operate such track along a designated route for the period of 30 years.

After the ordinance had been passed upon first reading, it was urged by representatives of the Memphis Freight Bureau, an organization composed of various business enterprises in and around the city of Memphis—whose motives are assailed by the Railroad Company on the theory that they were in fact seeking merely to protect the interests of a rival compress company located in South Memphis—that the consent of the city council should not be given to the construction of the proposed track except upon various conditions, necessary, it was insisted, to protect the interests of cotton shippers, and the public generally. After much discussion the city council finally, in August, 1907, passed the ordinance, but in a materially amended form. By the first section of the ordinance as passed, the Railroad Company was granted the right, in the language of the original draft submitted by it, to construct and operate a railroad track commencing at a point on its incline track and running thence southwestwardly "to and across the property owned by the Gulf Compress Company, * * * to or near the west (east) bank of the Mississippi river," with the right to cross Livermore avenue and other intervening avenues of the city. By the subsequent sections of this ordinance, however, various requirements and conditions were imposed upon the Railroad Company, among others that it should switch without charge all loaded freight cars to and from other railroads and shippers located on their tracks within the switch limits of Memphis (which extended beyond the corporate limits) coming in or destined to go out over the lines of such railroads; that it should receive, transport, and switch all loaded freight cars offered by other railroads or shippers within the switch limits of Memphis on the same basis of charges, without discrimination, and should charge no more than $2 per car therefor, empty cars to be switched free; that it should deliver to and receive at its then depots

and platforms and to and from other compresses and warehouses located on its tracks and those of connecting lines within the switch limits of Memphis and deliver to warehouses within the drayage limits of Memphis, all consignments of cotton containing not less than 16 bales, coming in or destined to go out over its tracks, and make the same freight rates and switching charges thereon as charged on shipments of like character to and from the Gulf Compress Company's plant; that it should never permit any other railroad company to enter Memphis over its tracks unless it should have first made with the city a contract not to discriminate against the city or its citizens in the carriage of freight and passengers; that these conditions should apply to all railroads which it might permit to use the tracks which it was authorized to lay under the ordinance; and that it should within 90 days from the passage of the ordinance pave with gravel a certain portion of a designated city street which was to be crossed by its track, which paving it is shown would cost about $9,000. This ordinance also provided that the grant thereby made should be subject to the will of the city council and be revocable by the council at its pleasure; and, further, that the Railroad Company should accept the ordinance in writing within 30 days after its passage and approval, and that upon such acceptance the ordinance should constitute a contract between the city and the Railroad Company.

Prior, however, to the passage of the ordinance, the Railroad Company, through its attorney, notified the city council that it could not accept the grant under the proposed amended ordinance. And upon the passage and approval of the ordinance the Railroad Company did not execute its written acceptance within 30 days thereafter and has never executed such acceptance. It, however, proceeded with the construction of its proposed line of track, prosecuting its work at first over private property lying between the city streets, over which it had procured rights of way at large expense. And, finally, after notice that the mayor had instructed the police to stop its work if it should undertake to cross Livermore avenue, and without any subsequent authority from the city, it hastily laid its tracks across Livermore avenue at night time when the police were not on guard. This track was thereafter torn up by the city police acting under the direction of the mayor, whereupon the Railroad Company filed its bill in the court below praying an injunction to restrain the city and its chief of police from interfering with its track. And, upon the granting of a preliminary injunction, it proceeded to reconstruct the track that had been torn up, and has made connection at the western line of Livermore avenue with the spur tracks of the Compress Company.

The theory upon which the Railroad Company insists that it is entitled to the injunctive relief prayed in its bill is, as set forth in the averments of its bill and developed in argument, substantially this: That the track in question is a lateral road which it was building to the eastern bank of the Mississippi river, a navigable stream, and to the plant of the Compress Company on the bank of said river, where it was proposed there would be facilities for receiving and shipping cotton coming to and from the city of Memphis by boats on the Mississippi river; that it had direct legislative authority to construct such

lateral road under chapter 210 of the Tennessee Acts of 1903; that, having such direct legislative authority, the city had no legal right to withhold its consent to the construction of such road, or to annex to its consent any conditions which it might not impose upon all railroads alike by general ordinance, and had no power to require the Railroad Company to·enter into a written contract with the city as a condition precedent to the exercise of its statutory right, but had, at most, the right in the exercise of its police power to regulate the location and construction of the track; that the conditions precedent imposed by the ordinance to the crossing of the city streets by the Railroad Company's tracks were beyond the authority of the city, unauthorized, and void; and that the city having, by the first section of the ordinance, completely exercised its valid police power and consented to the loca-- tion and construction of the railroad tracks, the Railroad Company had hence the right to disregard the unauthorized conditions attached to the city's consent, and was entitled, under the consent legally given by the first section of the ordinance, to proceed with the construction of its track without complying with the other conditions imposed therein, and without accepting the ordinance as therein required.

Section 1, c. 210, Tenn. Acts of 1903, p. 461, upon which the Railroad Company relies as direct legislative authority for the construction of this track, amends section 1, c. 152, Acts 1895, p. 314, so as to read as follows:

"That any railroad chartered under the laws of the state of Tennessee or any other state or states, and now operating or which may hereafter operate any line of railroad in this state, is hereby granted authority and power to build lateral roads, not exceeding fifteen miles in length, extending from the main stem, or any branch of said line of railroad, to any mill, quarry, mine, manufacturing plant, or to the bank of any navigable stream, without the making of any amendment to the charter of said railroad; provided, private property shall not be taken for the uses of such railroad company, or the construction of such lateral branches, without the condemnation thereof, as now provided by law."

The city, on the other hand, contends, in substance, (1) that the track in question is not one of a character whose construction is authorized by the act of 1903; and (2) that, even if so authorized, yet nevertheless, under the broad charter powers of the city of Memphis, it could only be constructed through the city and over its streets by the consent of the city council; that in granting to the Railroad Company the right to lay its tracks through the city the council had the right to attach any conditions to the granting of such privilege, of a contractual nature or otherwise, which in its judgment the public interest required, even although such conditions would not have been valid as original and independent acts of legislation on its part; and that, the ordinance granting the Railroad Company such right upon specified conditions not having been accepted by the Railroad Company, it is entirely without authority to build the track in question.

·After careful consideration of the questions involved we have reached the following conclusions:

1. Chapter 210 of the Tennessee Acts of 1903, being the enabling act upon which alone the Railroad Company relies, does not constitute legislative authority for the construction of the track in question, for

the reason that it is not being constructed as a lateral road to any of the points mentioned in the act; that is, either to a mill, quarry, mine, manufacturing plant, or the bank of a navigable stream.

We think it is clear that this track is not being constructed as a lateral road extending to the bank of a navigable stream. It is apparent from the contract between the Railroad Company and the Compress Company and the other proof in the case that the Railroad Company does not intend to construct this track to the river bank, but has constructed it merely as a lateral road for the purpose of reaching the eastern boundary of the property of the Compress Company, under the contract giving the Railroad Company the right to use, for the purpose of handling cotton, the spur tracks of the Compress Company, which extend only to its warehouses and compresses, and are not at present connected with the river in any way. And, while there has been an indefinite understanding between the Railroad Company and the Compress Company that the Compress Company would at some time construct a lift to the river and would then allow the Railroad Company the use of its spur tracks and lift for the purpose of handling lumber, logs, and cotton, there has been no definite contract upon this subject and not even an understanding with reference to the use of such tracks and lift for the purpose of handling other freight in general. That the railroad track is not intended for the purpose of reaching the bank of the river, but merely for the purpose of reaching the plant of the Compress Company, is emphasized by the fact that in the original petition of the Railroad Company to the city council it stated merely that it desired to construct an additional track for the purpose of reaching a new compress to be erected on the bank of the Mississippi river, the objective point being evidently the compress and the reference to the river merely for the purpose of describing the location of the compress.

However, giving to chapter 210 of the Acts of 1903 a just and reasonable construction, we think it clear that it was only intended to authorize a railroad company to extend a lateral road to the bank of a navigable stream when it proposes to extend its track direct to the bank of the river, for the purpose of forming a connection with river transportation and serving as a common carrier for the transportation of traffic to and from the river, and that, thus construed, the act manifestly does not authorize the construction of a lateral road which falls short more than a quarter of a mile of reaching the river bank, and when the Railroad Company does not propose to extend its track to the river, but merely proposes to handle for the present one particular kind of freight, namely, cotton, to and from a private plant located some 500 feet from the river bank, with no present connection whatever for the purposes of river transportation, and with only a vague expectation that at some future date this private plant may extend its tracks to the river and may then, if it sees fit, allow the Railroad Company to use its private tracks for the transportation of such commodities as may hereafter be mutually agreed upon.

Holding this view as the proper construction of chapter 210 of the Acts of 1903, it is not necessary to determine whether, if the track in question were otherwise authorized under the act for the purpose of

reaching the bank of the river, such right would be defeated, as the city insists, by the fact that the Railroad Company already has a direct connection with the river bank at a point about three-quarters of a mile away.

It is also suggested by counsel for the Railroad Company in argument, although the point is not pressed, that the track in question is authorized under this act of 1903 as a lateral road constructed for the purpose of reaching the Compress Company's plant upon the theory that the compress may be regarded as a manufacturing plant within the meaning of the act. We cannot, however, adopt this suggestion.

It is stated in the brief for the Railroad Company that a compress plant receives bales of cotton in their original state and by a process of compressing, rebinding, and recovering, if need be, with new bagging, changes the form, size, and condition of the bales so as to make them suitable for convenient transportation to distant points at home and abroad. We are of the opinion that such a compress is not a manufacturing plant within any just definition of that term. In Worcester's Dictionary the word "manufacture" is defined as "the process of making anything by art, or reducing materials into a form fit for use by hand or by machinery"; and in the Standard Dictionary, as "the making of wares or other products by hand, by machinery, or by other agencies."

While various definitions of the terms "manufacture" and "manufacturing plant" are given in the adjudged cases, making it difficult to frame an exact definition of the term "manufacturing plant" as defined by the unbroken weight of authority, the closest analogy to the precise question now under consideration is to be found in those decisions which hold that the cutting of natural ice on the surface of a pond into pieces of a convenient size for handling, and storing the pieces so cut in a building, is not a "manufacture" within the meaning of the tax laws, the material being in no way changed, or adapted to any new or different use, but remaining ice, to be used simply as ice (Hittinger v. Westford, 135 Mass. 258, 262); that a corporation organized to collect, store, and preserve natural ice, prepare it for market and transport and vend it, is not a manufacturing corporation within the meaning of the tax laws, its tools and conveniences being "for convenience in handling and marketing a product, and not at all for making it" (People v. Knickerbocker Ice Co., 99 N. Y. 181, 183, 1 N. E. 669); that a corporation engaged in roasting, mixing, and grinding coffee is not a manufacturing company within the meaning of the tax laws (People v. Roberts, 145 N. Y. 375, 40 N. E. 7; City of New Orleans v. Coffee Co., 46 La. Ann. 86, 14 South. 502); that marble which has been cut into blocks simply for convenience in transportation is not a manufactured article within the meaning of the tariff laws (United States v. Wilson, 1 Hunt, Mer. Mag. 167, 28 Fed. Cas. 724); and that hay which has been pressed in bales ready for market is not a manufactured article within the meaning of the tariff laws, although labor has been expended in cutting and drying the grass and bailing the hay (Frazee v. Moffitt (C. C.) 20 Blatchf. 267, 18 Fed. 584); these last two cases, it is to be noted, being cited with approval in Hartranft v. Wiegmann, 121 U. S. 609, 615, 7 Sup. Ct. 1240, 30 L. Ed. 1012.

And so it is held that the mere fact of the application of labor to an article, either by hand or machinery, does not make it a manufactured article within the meaning of the tariff laws, unless the application of such labor effects some transformation in the character of the article and converts it into a new and different article, having a distinctive name, character, or use. Hartranft v. Wiegmann, 121 U. S. 609, 615, 7 Sup. Ct. 1240, 30 L. Ed. 1012; Foppes v. Magone (C. C.) 40 Fed. 570, 572; United States v. Semmer (C. C.) 41 Fed. 324, 326; Baumgarten v. Magone (C. C.) 50 Fed. 69, 71.

In view of these authorities, we are of the opinion that as a compress plant does not, in any way, transform the cotton into a new or different article, having any distinctive name, character or use, but merely adapts it for more convenient transportation, after which the cotton is used in exactly the same manner as before it was compressed, and for exactly the same uses and purposes, it cannot be properly said that a compress is a manufacturing plant.

We therefore conclude that in no aspect of the case can chapter 210 of the Acts of 1903 be construed as giving legislative authority to the Railroad Company for the construction of the lateral road in question.

It is also faintly suggested on behalf of the Railroad Company that authority to construct the track in question may be derived from chapter 216, Tenn. Acts 1903, p. 470, which provides that any railroad company owning or operating a railroad or any part thereof in Tennessee shall be authorized and empowered to relocate any part of its lines for the purpose of taking out curves and reducing curves, and to build second main or double tracks, turnouts, switches, stations, depots, and terminal facilities. It is a sufficient answer to this suggestion that there is no averment in the complainant's bill that the track in question is being constructed by the Railroad Company under the authority of the last-mentioned act, the bill predicating the right to construct this track solely upon the theory that it is a lateral road constructed under the authority of chapter 210 of the Acts of 1903. We furthermore think it clear that this track can neither be regarded as a terminal facility nor as a turnout or switch of the character contemplated by chapter 216 of the Acts of 1903. The phrases "turnouts" and "switches" in our opinion clearly relate to tracks in the nature of side tracks, adjacent to and used in connection with another line of track, and manifestly do not refer to a track such as that in dispute which branches off entirely from the existing line and extends laterally to a distant objective point, and which can only be properly described as a lateral road.

It results that in our opinion the complainant Railroad Company is under the proof in this case entirely without direct legislative authority for the construction of the track in question.

2. It necessarily follows in our opinion that it could not acquire any right, as against the city of Memphis, to construct or maintain this track through the city limits and over the city streets without accepting the ordinance passed by the city council granting it a right of way through the city upon the various terms and conditions set forth in the ordinance.

By the provisions of the Tennessee statutes constituting the charter of the city of Memphis, contained in chapter 11, Tenn. Acts 1879, p. 15, known as the Original Taxing District Act, and numerous amendments thereto, the streets of the city were transferred to the board of fire and police commissioners "to remain public property," for the uses to which they had been formerly applied (Acts 1879, p. 25, c. 11, § 14); and it was provided that the local government established by the act shall "have and exercise entire control over all streets"; that it shall "have power * * * to permit and regulate the laying off of railroad tracks or iron, and the passage of railroad cars" through the city (Acts 1879, p. 98, c. 84, § 1); that the city council shall "have charge and control of giving, granting and sale of all franchises, special privileges to individuals, firms or corporations" (Acts 1905, c. 54, § 28, p. 108); and "that no franchise shall be granted or sold to any commercial railroad * * * or other quasi-public corporation except by ordinance fully guarding and protecting the rights of the public" (Acts 1905, c. 54, § 29, p. 108).

It was held by this court in Iron Mountain Railway Co. v. Memphis, 96 Fed. 113, 37 C. C. A. 410, in an opinion delivered by Judge Taft, that under the charter powers of the city of Memphis to regulate the laying of railroad iron and passage of cars through the city and to exercise complete control over all the city streets, a contract entered into between the city and a railroad company, as a condition precedent to granting the railroad company the right to lay its tracks through the streets of the city, that the railroad company would not during the term of the contract discriminate in rates against the city or its inhabitants in the carriage of freight or passengers, was a valid and enforceable contract, the obligation of which could not be thereafter impaired by resolution of the city council. And in Memphis v. Postal Telegraph Co., 145 Fed. 602, 605, 76 C. C. A. 292, it was held by this court, in an opinion delivered by Judge Severens, that, under the provisions of the charter of the city of Memphis giving it entire control over all the city streets, it was authorized to demand and receive compensation for the use of its streets by a telegraph company, and that the control over the streets given to the city by the charter provisions of 1879 was not taken away by implication by a subsequent statute passed by the Tennessee Legislature in 1885, authorizing in general terms any telegraph company to construct, operate, and maintain its lines over the streets of the cities and towns of the state, but that such subsequent general law operated only as a permission to exercise in the streets of Memphis the franchise granted to telegraph companies subject to the control which the Legislature had already granted to the city.

It is, however, unnecessary to determine to what extent, if the Railroad Company were armed with direct legislative authority for the construction of the lateral road in question, its exercise of that right within the city limits of Memphis would, in the light of the above-mentioned decisions of this court and of various decisions of the Supreme Court of Tennessee that have been cited in argument, be sub-

ject to the consent of the city authorities under the city charter or general laws, or what terms, if any, might in such case be properly attached by the city as conditions to the giving of such consent. Nor are we called upon to determine the validity or enforceability, as between the city and the Railroad Company, of certain provisions of the ordinance granting it that right which are criticised by the Railroad Company as contravening the interstate commerce act. It is sufficient to say, for the purposes of the present case, that we are of the opinion that the ordinance granting the Railroad Company the right to construct and maintain its lateral road through the city of Memphis and across the city streets and embodying the terms upon which the city's consent is given thereto is an entirety; that an essential provision of this ordinance is that the Railroad Company shall accept it in writing as a contract between the city and the Railroad Company; that, not having thus accepted the ordinance and complied with this condition precedent upon which the city's consent was predicated, the Railroad Company has not brought itself within the terms of that consent; and that hence, in the absence of direct legislative authority, the Railroad Company has acquired no right, as against the city, to build or maintain its lateral road under the first section of the ordinance, and is not entitled to obtain from a court of equity an injunction restraining the city authorities from interfering with its construction, maintenance or use.

The court below was of opinion that the present case is controlled by Frayser v. State, 16 Lea (Tenn.) 671, and that under the doctrine of that case it must be held that the city of Memphis could not by ordinance force the Railroad Company to enter into a contract with the city before it should build its track over the city streets. That case, however, is in our opinion clearly distinguishable from the present case, in that the special charter of the Railroad Company which was there involved gave the company, in specific terms, the right to construct, maintain, use, and operate street railways over the streets of the city of Memphis, and the city sought, in violation of the specific power there given the company by its charter under direct legislative grant, to bind it by contracts affixing to the granting of a right of way by the city council certain stipulations as to the mode and manner of constructing its tracks.

For these reasons, therefore, we conclude that there was clear error in the decree of the court below in adjudging that the plaintiff was entitled to an injunction restraining the city of Memphis and its chief of police from interfering with the complainant's tracks; and this error being of a controlling character, vitally and directly affecting the rights of the parties, we are of the opinion that it is one of which this court should take notice, even without sufficient assignments of error, under the option reserved to the court by the concluding clause of rule 11.

A decree will accordingly be entered reversing the decree of the Circuit Court and remanding the case, with directions to dismiss the bill at the costs of the complainant.

NOTE.—The following is the opinion of McCall, District Judge, in the court below:

McCALL, District Judge. This case was heard on the merits in July, 1908. The primary and controlling question presented for adjudication is whether the defendant the city of Memphis, under its charter, has the authority to compel the Kansas City, Ft. Scott & Memphis Railway Company, and the St. Louis & San Francisco Railroad Company, complainants, by ordinance, to enter into a contract with the city, as a prerequisite to the right of the complainants to construct a railroad track across the streets of the city of Memphis, particularly Livermore avenue.

It appears that on August 8, 1907, the legislative council of the city of Memphis passed an ordinance, the first section of which grants to the complainants the right to construct a railroad track, commencing at some point between Kansas avenue and Louisiana avenue, running in a southwesterly direction to or near the west bank of the Mississippi river, with the right to cross, among others, Livermore avenue. The second section provides that the grant is made subject to all restrictions and conditions existing between complainants and the defendant city. There are eight other sections of the ordinance, imposing other and different conditions and obligations upon the complainants. The eighth section is as follows: "Be it further ordained, that said railways shall accept this ordinance in writing, executed by the properly authorized officer or agent of said companies, and under the corporation seals thereof, within thirty days after its passage and approval, and upon such acceptance this ordinance shall constitute a contract between the city of Memphis and the St. Louis & San Francisco Railroad and the Kansas City, Ft. Scott & Memphis Railroad."

The complainant railway companies, without complying with this eighth section of the ordinance, proceeded to construct their track as provided for in the first section of the ordinance, and had crossed Livermore avenue. The city authorities then tore up the track across this avenue. At this juncture the complainants filed the bill in this cause to enjoin and restrain the city and its officers from interfering with them in constructing this railroad track, and from reconstructing same where defendants had destroyed it, and from interfering with the quiet and peaceable use of the same for railroad purposes. Upon this application a preliminary injunction was issued.

The complainants insist that they have the right to construct this piece of railway track under chapter 210, p. 461, Acts of 1903, which is as follows: "That any railroad company chartered under the laws of the state of Tennessee or any other state or states, and now operating or which may hereafter operate any line of railroad in this state, is hereby granted power and authority to build lateral roads not exceeding fifteen miles in length, extending from the main stem or any branch of said line of railroad to any mill, quarry, mine, manufacturing plant, or to the banks of any navigable stream, without making any amendment to the charter of said railroad."

The defendants insist that the city was authorized to enact the ordinance of August 8, 1907, and enforce the same, under and by virtue of section 3 of the charter of the city of Memphis, which is as follows: "Sec. 3. The local government established by this act shall have power * * * to permit and regulate the laying of railroad tracks of iron, and the passage of railroad cars through the city, and to remove such railroad track, if it obstructs public travel or does not conform to the laws of the district;. * * * to repair, and keep in repair, streets, sidewalks and other public grounds and places in the city; to open and widen streets, to change the location [of] or to close same and to lay off new streets and alleys when necessary; to have and exercise entire control over the streets and other public property of the city, as well that within as that without the city."

Assuming that the ordinance in question was regularly passed, I conclude that the complainant railway companies, by constructing their tracks thereunder, are subject to all the conditions imposed therein that the legislative council of the city was authorized to enact under its charter, notwithstanding complainants constructed their tracks without accepting the ordinance in writing, as provided in section 8 of the ordinance. A compliance by the complainants with the eighth section would probably estop them from success-

fully resisting the enforcement by the city of such sections of the ordinance as were enacted without authority, and therefore void, unless agreed to by them in writing.

As stated in the opening paragraph of this memoranda: Had the city the authority to enact section 8 of the ordinance of August 8, 1907, and to prevent the complainants from crossing Livermore avenue with their tracks, unless they complied with said section 8? In other words, can the city by ordinance compel complainants to enter into a written contract which complainants conceive to be unduly burdensome, oppressive, and partial, in order to exercise a right granted to them by the Legislature of Tennessee?

I think not. And this conclusion is sustained by the Supreme Court of Tennessee in the case of Frayser et al. v. State, 16 Lea, 671. That case went up from the city of Memphis. One of the important questions involved was whether the city could by ordinance force the Memphis City Railroad Company to enter into a contract with the city before it should build its tracks along the streets of the city, as it had the right to do under its charter. In disposing of the case, Mr. Chief Justice Deadrick, speaking for the court, said: "The city may pass proper rules and regulations in respect to said road. The charter reserves that right to it. The law confers it, but they cannot force the company to contract with it. For any threatened or actual violation of law by the company, the city has its remedy."

Upon the Frayser Case I am satisfied to base the decision in this case. All I now decide is that the city had the right to pass the ordinance, and the railroad company, if it constructed its track under the ordinance, would be liable to such conditions and obligations as the city had authority to impose by ordinance. But I hold that the city had no authority to enact section 8, requiring the railroad company to sign an agreement that it would accept all the terms of the ordinance as a condition precedent to building its spur track. Whether or not other conditions imposed by this ordinance are reasonable and valid must be determined when it is shown that complainants have not complied with them.

A decree will be entered, making perpetual the preliminary injunction heretofore granted, as prayed for in the bill, and taxing the defendants with the costs of the cause. Also see Railroad v. Railroad, 116 Tenn. 526, 95 S. W. 1019.