DETROIT & M. RY. CO. v. BOYNE CITY, G. & A. R. CO.

HENRY v. SAME.

(District Court, E. D. Michigan, N. D.   January 27, 1923.)

Nos. 28, 29.

1. **Railroads** ⬿7—**Authority of Interstate Commerce Commission not required for construction of spur, switching, or industrial tracks.**

In Interstate Commerce Act, § 1, par. 22, as amended by Transportation Act Feb. 28, 1920, § 402, providing that the provisions of the preceding paragraphs requiring authority of the Interstate Commerce Commission for the construction or extension of railroad lines or their abandonment "shall not extend to the construction or abandonment of spur, industrial, team, switching or side tracks, located or to be located wholly within one state, or of street, suburban or interurban electric railways, which are not operated as a part, or parts, of a general steam railroad system of transportation," the final clause applies only to "electric railways," and not to "spur, industrial," etc., tracks.

2. **Railroads** ⬿7—**Proposed track held an "extension" or "branch line," requiring certificate from Interstate Commerce Commission.**

Defendant railroad company, doing an interstate business, proposed to build a track from a connection with its main line 3¾ miles long to shale beds owned by a cement company. By contract the cement company was to load trains at its quarry, which were to be moved by defendant over such track and its main line to the cement factory,' 10 miles distant. The track was also to be used by the public for loading and shipment of other commodities, and under the laws of the state would be subject to control of the state Public Utilities Commission, which has power to require regular train service thereon, and would also in all probability be later extended to other shale beds and for general purposes. The cement company's quarry is already served by complainant's railroad by means of a spur track ¼ of a mile long. *Held*, that such track is an "extension" or "branch line" within the meaning of Interstate Commerce Act, § 1, par. 18, as amended by Transportation Act Feb. 28, 1920, § 402, and its construction requires authority from the Interstate Commerce Commission.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Branch; Extend—Extension.]

3. **Railroads** ⬿7—**"Extension" or "new line," distinguished from "spur track."**

The difference between new lines or extensions, on the one hand, and spur, industrial, team, switching or side tracks on the other, as the terms are used in Interstate Commerce Act, § 1, pars. 18–22, as amended by Transportation Act Feb. 28, 1920, § 402, is that the former are tracks over which there are to be train movements in the sense that such movements are a part of the actual transportation haul from the shipper to the consignee, while the latter named tracks are for use in loading, reloading, storing, and switching the cars and other things merely incidental to the regular train haul.

4. **Railroads** ⬿7—**Plaintiff held "party in interest" entitled to enjoin building of unauthorized extension.**

A railroad company with which a proposed extension by another company will come in competition, or the owner of land over which such extension will pass, is a "party in interest" within the meaning of Interstate Commerce Act, § 1, par. 20, as amended by Transportation Act Feb. 28, 1920, § 402, and may maintain a suit to enjoin construction of such extension in violation of the act.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Interest (In Suit or Action).]

⬿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Suit by the Detroit & Mackinac Railway Company and by Charles R. Henry against the Boyne City, Gaylord & Alpena Railroad Company. Decrees for complainants.

Henry & Henry, of Alpena, Mich., and Victor D. Sprague, of Cheyboygan, Mich., for plaintiffs.

J. M. Harris, of Boyne City, Mich., and Hinton E. Spalding, of Detroit, Mich., for defendant.

TUTTLE, District Judge. These two causes involve the same material questions of fact and of law and have been tried together on final hearing upon the pleadings and proofs. The bills, which are substantially identical except that each is filed by a different plaintiff, pray the same relief, namely, an injunction restraining the defendant railroad company from constructing or operating certain new tracks, which defendant proposes to construct and use, without first obtaining from the Interstate Commerce Commission a certificate of public necessity and convenience. Whether such a certificate is required for the construction of such tracks is the ultimate question presented.

[1] The determination of the question just stated requires a consideration of the construction and effect of paragraphs 18, 19, 20, and 22 of section 1 of the Interstate Commerce Act (being the Act of February 4, 1887, c. 104, 24 Statutes at Large, 379, entitled, "An act to regulate commerce," as amended), which paragraphs were added to said section 1 by section 402 of the so-called Transportation Act (the Act of February 28, 1920, c. 91, 41 Statutes at Large, 456, 477).

The paragraphs referred to provide as follows:

"(18) After ninety days after this paragraph takes effect no carrier by railroad subject to this act shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this Act over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad, and no carrier by railroad subject to this act shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment.

"(19) The application for and issuance of any such certificate shall be under such rules and regulations as to hearings and other matters as the Commission may from time to time prescribe, and the provisions of this act shall apply to all such proceedings. Upon receipt of any application for such certificate the Commission shall cause notice thereof to be given to and a copy filed with the Governor of each state in which such additional or extended line of railroad is proposed to be constructed or operated, or all or any portion of a line of railroad, or the operation thereof, is proposed to be abandoned; with the right to be heard as hereinafter provided with respect to the hearing of complaints or the issuance of securities; and said notice shall also be published for three consecutive weeks in some newspaper of general circulation in each county in or through which said line of railroad is constructed or operates.

"(20) The Commission shall have power to issue such certificate as prayed for, or to refuse to issue it, or to issue it for a portion or portions of a line

of railroad, or extension thereof, described in the application, or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. From and after issuance of such certificate, and not before, the carrier by railroad may, without securing approval other than such certificate, comply with the terms and conditions contained in or attached to the issuance of such certificate and proceed with the construction, operation, or abandonment covered thereby. Any construction, operation, or abandonment contrary to the provisions of this paragraph or of paragraph (18) or (19) of this section may be enjoined by any court of competent jurisdiction at the suit of the United States, the Commission, any commission or regulating body of the state or states affected, or any party in interest: and any carrier which, or any director, officer, receiver, operating trustee, lessee, agent, or person, acting for or employed by such carrier, who knowingly authorizes, consents to, or permits any violation of the provisions of this paragraph or of paragraph (18) of this section, shall upon conviction thereof be punished by a fine of not more than $5,000 or by imprisonment for not more than three years, or both.   *   *   *

"(22) The authority of the Commission conferred by paragraphs (18) to (21), both inclusive, shall not extend to the construction or abandonment of spur, industrial, team, switching or side tracks located or to be located wholly within one state, or of street, suburban, or interurban electric railways, which are not operated as a part or parts of a general steam railroad system of transportation."

After careful study of the language of the statute quoted, I am satisfied that under the correct construction of the last preceding paragraph, the final restrictive clause thereof qualifies and refers to the words "electric railways" and not the words "side tracks," and that the rights of the parties hereto depend upon the question whether, on the one hand, the proposed construction of these new tracks by the defendant would constitute "the construction   *   *   *   of spur, industrial, team, switching or side tracks," or whether, on the other hand, such construction by defendant would be "the extension of its line of railroad, or the construction of a new line of railroad," within the meaning of these three subdivisions of the section of the Interstate Commerce Act here involved. The tracks mentioned are proposed to be located wholly within the state of Michigan. No certificate has been obtained from the Interstate Commerce Commission. If, then, such truck will be a spur track, defendant is entitled to proceed with its construction without a certificate from the Interstate Commerce Commission. If, however, such track is an "extension" or "a new line" of railroad, plaintiff is entitled to the injunction sought.

The parties entered into the following stipulation, which has been filed in the cause:

"All statements of fact contained in the bill of complaint herein which are admitted by the answer herein are true.

"The railroad contemplated to be built by defendant affected by this proceeding, and running from the shale bed of the Huron Portland Cement Company to the main line of defendant, is 3¾ miles long.

"Defendant is engaged in interstate commerce, and the said track 3¾ miles long running from the Huron Portland Cement Company shale beds to the main line of defendant will be used and is to be constructed and is to be operated as part of defendant's general steam railroad system of transportation for the transportation of freight upon and across it and defendant's main and other railroad.

"The location of said proposed line of 3¾ miles from said Huron Portland Cement Company's shale beds to the main line of defendant, the location of the main line of the defendant in Alpena county and the location of the Hillman branch of the Detroit & Mackinac Railroad with its agency and non-agency stations thereon, in Alpena county, is correctly shown by Exhibit A attached to the bill of complaint of plaintiff herein and by the map of Alpena county to be used and made a part of the evidence at the hearing.

"Whether said line proposed to be constructed by defendant running 3¾ miles in length from the Huron Portland Cement's Company's shale beds to the main line of defendant constitutes an extension or addition of defendant's line of road or a new line of railroad or a railroad line within the meaning of section 1, par. 18, of the Interstate Commerce Act, or whether said railroad is a spur, and if a spur whether such a spur as to be within the meaning of section 1, par. 22, of said act, requiring an Interstate Commerce Commission certificate, is a disputed question and not stipulated by the parties hereto.

"Except as hereinbefore stated and agreed upon, wherever the facts are disputed the court shall determine the facts, and in such determination the court may consider that plaintiff's proofs sustain plaintiff's allegations on said disputed facts and defendant's proofs sustain defendant's allegations on said disputed facts, except as modified by the exhibits read into the record, including admissions of defendant respecting the new line of railroad complained of and other exhibits used and admitted on the hearing. When determined by the court, said determination of said disputed facts shall be considered and treated as the true facts for the purposes of this litigation."

The material facts, as found by me from the record before the court, are as follows:

All of the parties are residents and citizens of Michigan and of this distict, and the jurisdiction of this court is properly invoked under, and based upon, subdivision 8 of section 24 of the Judicial Code (Comp. St. § 991), conferring on the District Court jurisdiction of "all suits and proceedings arising under any law regulating commerce"; these companion bills being filed pursuant to the express provisions of paragraph 20 of section 1 of the Interstate Commerce Act, already cited and quoted. The Boyne City, Gaylord & Alpena Railroad Company (hereinafter termed the defendant railroad) has for about 12 years last past maintained and operated, as it now does, a common carrier railroad from Alpena, Mich., on Lake Huron, where such railroad has good water connections, westerly across the state of Michigan about 92 miles to Boyne City, Mich., on Lake Michigan, where said railroad also has advantageous water connections. It is engaged in interstate as well as intrastate commerce and is subject to the Interstate Commerce Act. About 5 miles west of Alpena its main line of railroad, which at that point runs in a general northeasterly to soutwesterly direction, intersects the so-called Hillman Branch line of the Detroit & Mackinac Railway Company (hereinafter termed the plaintiff railroad), which branch line of the plaintiff railroad extends westerly from Alpena to the town of Hillman, about 24 miles west of Alpena, and there ends. East of the said point of intersection of the aforesaid lines, both railroads run in a general easterly and northeasterly direction, for about 5 miles, as just stated, to Alpena. West of said intersection, the plaintiff railroad runs westerly to Hillman; while the defendant railroad runs, from such point of intersection, first southwesterly and then westerly, parallel to, and just south of, plaintiff

railroad, being about 6 miles south of Hillman while passing to the south of it toward Boyne City, its already mentioned western terminus. From the point of intersection just referred to, the plaintiff railroad runs west, about 19 miles to Hillman, stopping at a number of towns and stations along the route and serving several communities and industries along the way. Among the latter are certain shale deposits and a quarry, located 3¾ miles west of the aforesaid railroad intersection, which shale quarry and beds are owned by the Huron Portland Cement Company (which operates a cement-making plant in Alpena, about 10 miles east and north of said quarry), and are located about a fourth of a mile north of said plaintiff's Hillman branch, and, by means of side tracks, are reached and served by such branch; there being a station thereon at this point called Paxton. The trackage involved in this controversy consists of a track which the defendant railroad proposes, and has commenced, to construct westward from a point on its main line located about 80 rods north of the aforesaid intersection, to run for about 3¾ miles in a westerly direction parallel to, and about a quarter of a mile north of, the aforementioned line of the said Hillman branch of plaintiff railroad, to the shale beds and quarry just mentioned. Said track will bridge a river about 100 feet wide and will cost about $75,000. Said proposed track will cross land owned by the plaintiff Charles R. Henry.

Prior to the undertaking of the construction of this new trackage, the defendant railroad and the said cement company entered into certain traffic contracts providing for the operation by said cement company of trains from its said shale beds and quarry over said trackage to the main line of the defendant railroad, and thence over such main line to its manufacturing plant previously mentioned, a total distance of about 10 miles. The record shows, and I find, that such trains, complete including engine, will be made up and loaded on sidings and switches (connected with and incident to said proposed trackage) at the quarry in question and hauled, as trains of the defendant, in continuous and through transportation over the proposed track to the main line of the defendant and thence over said main line to the cement factory mentioned, in Alpena. The rates to be paid by the cement company for such transportation will be, in substance and essence, in the nature of line haul rates, being based upon the continuous trip as a whole and not involving switching service or charges. These full trains will be operated at frequent intervals. On the proposed route of this new track the defendant has a gravel pit from which, if such track be constructed, it will haul thereover considerable quantities of gravel; the loading being done by the aid of sidings to be located at said pit and used in connection with the proposed track. In addition to this shale and gravel, a certain quantity of farm and forest products will be carried from the territory through which said track will run, for the public residing or doing business there. Such of this last-mentioned freight as may be consigned to Alpena and points beyond will undoubtedly, as already stated, in part at least be carried easterly and northeasterly in continuous movement over the proposed track to and over the main line of the defendant, without the performance of any

switching service by the latter or the payment of any switching charge. West and northwest of the shale quarry mentioned are shale deposits and a farming district extending for a considerable distance, and it is clear that it would be only a question of time, if the track now proposed should be constructed, before a further extension of such track to the west or northwest of its present proposed terminus would be desired or required. Under the laws of Michigan (sections 8121 and 8122, Michigan Compiled Laws of 1915) the track sought to be constructed would be a public track subject to the control of the State Public Utilities Commission with respect to the kind and extent of train and transportation service to be furnished to the public. It is conceded in one of the characteristically able briefs of counsel for defendant that—

"The Commission may require that regular train service be given over a track built and originally operated as a spur, where transportation needs are such as to make a regular train service necessary for its reasonable accommodation."

[2] I am satisfied from the evidence, and I find, that said track will, if constructed, be used in interstate as well as intrastate commerce. I further find that if so constructed said track will necessarily create, and be used in, competition between the plaintiff and defendant railroads as parallel and competing lines, to the consequent injury of both of said railroads and of the public.

In view of the foregoing facts as found by me to exist, the question to be determined is whether the trackage sought to be constructed by the defendant will, if constructed, constitute, on the one hand, an extension of the defendant's present line of railroad, or a new branch line, or whether, on the other hand, it will be a spur, industrial, team, switching, or side track within the meaning of paragraph 22 of section 1 of the Interstate Commerce Act.

It is a cardinal principle of statutory construction that in interpreting the language of a statute the meaning of the words used must, if not so plainly expressed as to leave no room for doubt, be determined by a consideration not only of such words but also of the purpose with which they were used by the legislative body enacting such statute, and, consequently, of the object thereby sought to be accomplished.

It is certain that the purpose actuating Congress in adding to the Interstate Commerce Act the provisions here involved was, as was pointed out by Interstate Commerce Commissioner Clark while speaking before the Committee on Interstate and Foreign Commerce of the House of Representatives, when such committee was considering the enactment of these amendatory provisions, and shortly before such enactment, "to prevent the building of duplicate lines of railroad because of keen rivalry of certain financial interests, or when the railroads so built will not serve the present or future convenience and necessity, and will simply depend for traffic upon that which they can get away from railroads already built, adding to the total burden of maintenance, capital returns, etc., which the public must pay."

Congress had in mind and was endeavoring to correct the disastrous evils, to both the railroads and the public, which for many years had

286 F.—35

attended the construction of lines of railroad, main and branch, in ruinous competition with each other and with resultant injury to the public, which was compelled to bear the inevitable consequences of such a situation. `The statutory provisions now under consideration substituted, as the underlying basis for the construction of new lines of railroad (main and branch), in place of the previously controlling policy of the private desires and ambitions of owners of railroads, the new test and rule of public convenience and necessity. The specific mischief, however, which, in this particular instance, it was sought to guard against, was the construction of such new lines of railroad, not the construction of merely incidental tracks such as those excepted, by paragraph 22 of section 1, from the provisions of the statute. In view of the relatively small expense of these last-mentioned tracks and the inherent improbability of such construction unless actually needed in connection with main or branch lines, it was evidently deemed by Congress unnecessary, if not unwise, to require a public hearing, with the consequent procedural formality and conditions necessarily incident thereto, whenever it should be desired to lay one of these auxiliary tracks so commonly used and needed through the country.

While perhaps the essential characteristics and elements of such tracks might well have been described and the meaning of the language used more clearly defined, yet it is sufficiently plain, from a consideration of not only the obvious purpose prompting the statute but also of the general nature of the tracks mentioned, that Congress intended to subject to the requirements of the act so-called main or branch lines of railroad, that is, lines designed and used for continuous transportation service by through, full trains between different points of shipment or travel, and to exclude from the operation of the statute all that mass of "tracks" (as distinguished from "lines") naturally and necessarily designed and used for loading, unloading, switching, and other purposes connected with, and incidental to, but not actually and directly used for, such transportation service. The Century Dictionary defines the word "spur track" as "a short track leading from a line of railway and connected with it at one end only." Webster's New International Dictionary uses the term as synonymous with "stub track." It is, however, a matter of common knowledge that the term "spur track" is used to indicate one of the class of incidental tracks just mentioned. Neither the Interstate Commerce Commission nor any court has, so far as this court has been able to discover, attempted to frame a definition of the term within the meaning of the statute here involved, nor considered the precise question here involved. The Commission has, in one of its recent cases, expressed the opinion that—

"The line of demarkation between a spur track and a branch line of railroad is often somewhat vague and difficult of ascertainment, but we think that each case must be governed by its own facts."

It is urgently insisted by defendant that the distinguishing feature of a spur track is the absence of stations and regular train service thereon, and the classification of such tracks as spur tracks by the Interstate Commerce Commission in connection with its accounting prac-

tice is referred to in support of such contention. It must be borne in mind that the practice of the Commission referred to has no relation to the use or definition of the term within the meaning of this particular statute, as is indicated by the opinion of the Commission just quoted. Assuming, however (contrary to the conclusion of this court), that stations and regular train service were necessary elements of a branch line, and that their absence conclusively indicated a spur, and that they were not merely usual circumstances commonly connected therewith, this argument cannot, in my opinion, be applied to the present case. The track in question is not new in existence, but the record here shows conditions which I find would justify the proper public officials in requiring at least one station on, and regular train service over, the proposed new line.

[3] I will not at this time attempt to state a definition of the term "spur truck" which will necessarily be exact and complete in all cases, but in my opinion the distinguishing feature between "extensions" and "new lines," on the one hand, and "spur, industrial, team, switching or side tracks," on the other, as used in this statute, is this: That the former are tracks over which there are to be train movements in the sense that such movements are a part of the actual transportation haul from the shipper to the consignee, while the latter named tracks are for use in loading, reloading, storing, and switching the cars and other things merely incidental to the regular train haul. This track seems to be for the regular train haul in transportation proper rather than those incidental services characteristic of the tracks named as being excepted from the requirements of the act. Considering all of the facts and circumstances of the present case, including the proposed operation of entire trains over the proposed track and the main line of defendant in continuous transportation and without switching movements or charges; considering the sidings and public loading stations to be constructed and used in connection with said track; considering the expense of the proposed undertaking; considering the competitive character and results of the contemplated use and operation of said track and trains; considering the fact that the proposed track and train service will be between points where the competing railroad now maintains stations and between which the competing railroad now operates a regular train service; and in view of the entire record—I reach the conclusion that such proposed track has the characteristics of, and constitutes, not a "spur track," but a new "line," more specifically, an extension or a branch line. Akers v. United N. J. R. & Canal Co., 43 N. J. Law, 110; Illinois Central R. R. Co. v. Sioux Falls Quarry Co., 33 S. D. 63, 144 N. W. 724; Memphis v. St. Louis & San Francisco R. R. Co., 183 Fed. 529, 106 C. C. A. 75 (C. C. A. 6).

As the present line of defendant railroad is engaged in interstate commerce, and as this proposed extension, or branch, would, when completed, become a part of such interstate commerce railroad, said branch would thereby itself become a part of interstate commerce. For that reason, as well as because, even if it were entirely intrastate in character, its "unremunerative operation would or might burden or cripple the main line [of the defendant railroad] and thereby affect

its utility for service as an artery of interstate and foreign commerce" (State of Texas v. Eastern Texas Railroad Co., 258 U. S. 204, 42 Sup. Ct. 281, 66 L. Ed. ——), I cannot doubt that Congress constitutionally could, and under the statutory provisions hereinbefore considered did, make the construction of such track subject to the orders of the Interstate Commerce Commission and dependent upon the issuance by that body of the certificate prescribed in paragraph 18 of section 1 of the Interstate Commerce Act.

[4] I am of the opinion that the plaintiff in each of these suits is "a party in interest" within the meaning of paragraph 20 of said section, and as such entitled to the relief prayed, and that a decree should be entered restraining the defendant, its agents, attorneys, officers, and employees, and each of them, from undertaking the construction of the proposed extension of its line of railroad, that is, the branch line consisting of the proposed trackage mentioned and referred to in the bills of complaint herein, unless and until there shall first have been obtained from the Interstate Commerce Commission a certificate that the present or future public conveyance and necessity require, or will require, the construction of said extended and additional branch line of railroad, pursuant to the applicable paragraphs of section 1 of the Interstate Commerce Act hereinbefore cited.

A decree will be entered accordingly.