CENTRAL TRUST CO. OF ILLINOIS et al. v. GEORGE LUEDERS & CO. et al.

In re J. RHEINSTROM & SONS CO.

(Circuit Court of Appeals, Sixth Circuit. March 2, 1915.)

No. 2539.

1. CONSTITUTIONAL LAW ⬥211—EQUAL PROTECTION OF LAWS—LIMITATION ON LEGISLATIVE POWER OF STATES.

The equal protection clause of Const. U. S. Amend. 14, does not take from the states the power to classify the subjects of legislation, but leaves to the Legislatures a wide field of discretion in that regard, avoiding such classification only when unreasonable and arbitrary; and a legislative classification is presumed to be reasonable, and will be so held, unless it is apparent that there was and could be no reasonable basis therefor.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 678; Dec. Dig. ⬥211.]

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. CONSTITUTIONAL LAW ⚖=244—LIENS ⚖=8—MASTER AND SERVANT ⚖=69—
STATE STATUTES GIVING PREFERENCES IN INSOLVENCY—CONSTITUTION-
ALITY.

Ky. St. § 2487, in providing that, on the distribution among creditors
of the property of public service corporations or manufacturing estab-
lishments, employés and persons who shall have furnished materials or
supplies for the carrying on of the business shall have a lien on the prop-
erty involved in the business, is not unconstitutional, as in violation of
the equal protection clause of the federal Constitution.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 710;
Dec. Dig. ⚖=244; Liens, Cent. Dig. § 2; Dec. Dig. ⚖=8; Master and
Servant, Cent. Dig. §§ 78–81; Dec. Dig. ⚖=69.]

3. BANKRUPTCY ⚖=350—PRIORITIES BETWEEN CREDITORS—STATE STATUTE.

Priorities under such statutes are expressly recognized and authorized
in bankruptcy proceedings by Bankr. Act July 1, 1898, c. 541, § 64b (5),
30 Stat. 563 (Comp. St. 1913, § 9648).

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. 537; Dec. Dig.
⚖=350.]

4. LIENS ⚖=8—MASTER AND SERVANT ⚖=82—CONSTRUCTION—STATUTES GIV-
ING PREFERENCES IN INSOLVENCY PROCEEDINGS.

Ky. St. § 2487, giving a lien on the distribution of the assets of "any
owner or operator of any rolling mill, foundry, or other manufacturing
establishment," to employés and persons who shall have furnished ma-
terials or supplies for the carrying on of the business, is not limited, un-
der the doctrine of ejusdem generis, to manufacturing establishments of
the class of rolling mills and foundries, but construed in the light of the
manifest legislative intent, applies to all manufacturing establishments.

[Ed. Note.—For other cases, see Liens, Cent. Dig. § 2; Dec. Dig. ⚖=8;
Master and Servant, Cent. Dig. §§ 128–134; Dec. Dig. ⚖=82.]

5. BANKRUPTCY ⚖=350—CLAIMS ENTITLED TO PRIORITY—STATE STATUTE—
"MANUFACTURING ESTABLISHMENT."

Bankrupt corporation was engaged in the business of putting up and
selling what are known as Maraschino cherries. These cherries are im-
ported in casks, packed in brine and sulphurous acid, after being bleached.
After their receipt by the bankrupt they were washed through several
waters, stemmed, pitted, again washed, colored, sweetened, and boiled for
from 24 to 48 hours, then flavored, bottled, and labeled for the market.
The entire treatment in bankrupt's establishment took six days. The
cherries as grown and imported were not in fact Maraschino cherries,
but when so prepared were known as such in trade. Held, that bank-
rupt's business was that of conducting a "manufacturing establishment,"
within Ky. St. § 2487, which gives a lien to employés and persons fur-
nishing materials or supplies for the carrying on of the business of such
establishments on distribution of their assets, and that such statute was
applicable in the distribution of the bankrupt's estate.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 537; Dec.
Dig. ⚖=350.

For other definitions, see Words and Phrases, Second Series, Manufac-
turing Establishment.]

6. LIENS ⚖=8—CONSTRUCTION—STATUTE GIVING LIEN.

A statute giving a lien is regarded as a remedial statute, and is to be
liberally construed, so as to give full effect to the remedy, in view of its
beneficial purpose.

[Ed. Note.—For other cases, see Liens, Cent. Dig. § 2; Dec. Dig. ⚖=8.]

Appeal from the District Court of the United States for the Eastern
District of Kentucky; Andrew M. J. Cochran, Judge.

⚖=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In the matter of J. Rheinstrom & Sons Company, bankrupt. From an order allowing priority to claims of George Lueders & Co. and other creditors, the Covington Savings Bank & Trust Company, trustee, and the Central Trust Company of Illinois appeal. Affirmed.

For opinion below, see 207 Fed. 119.

L. F. Wormser, of Chicago, Ill., for appellants.

D. V. Sutphin, of Cincinnati, Ohio, for appellees.

Before KNAPPEN and DENISON, Circuit Judges, and SATER, District Judge.

KNAPPEN, Circuit Judge. This is an appeal from the order of the District Court allowing the claims of the appellees against the bankrupt estate as prior lien claims upon the property and effects of the bankrupt, by virtue of section 2487 of the Kentucky Statutes. The statute is printed in the margin of this opinion.[1]

The grounds of attack upon the order are (1) that the statute invoked is unconstitutional and in conflict with the Bankruptcy Act; (2) that the statute does not relate to manufacturing establishments other than those similar to rolling mills and foundries; and (3) that the bankrupt did not own or operate a manufacturing establishment.

[1-3] 1. The asserted ground of unconstitutionality is that the statute unreasonably discriminates in favor of those who furnish materials and supplies to manufacturing establishments, as against those furnishing money or machinery to the same establishments, as well as those furnishing materials and supplies to establishments not engaged in manufacturing, and discriminates against manufacturing establishments in favor of other establishments. We think this contention without merit.

The rule is well settled that the equal protection clause of the fourteenth amendment does not take from the states the power to classify the subjects of legislation, but leaves to the Legislatures a wide field of discretion in that regard, avoiding such classification only when unreasonable and arbitrary, and that a legislative classification is presumed to be reasonable unless it is apparent that there was and could be no reasonable basis therefor. Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 73–78, 31 Sup. Ct. 337, 55 L. Ed. 369, Ann. Cas. 1912C, 160, and cases there cited; Jeffrey Mfg. Co. v. Blagg, 235 U.

[1] Sec. 2487. Lien of Employés and Materialmen on Property Assigned for Benefit of Creditors.—When the property or effects of any [mine] railroad, turnpike, canal or other public improvement company, or of any owner or operator of any rolling mill, foundry or other manufacturing establishment, whether incorporated or not, shall be assigned for the benefit of creditors, shall come into the hands of any executor, administrator, commissioner, receiver of a court, trustee or assignee for the benefit of creditors, or shall in any wise come to be distributed among creditors, whether by operation of law or by the act of such company, owner or operator, the employés of such company, owner or operator in such business, and the persons who shall have furnished materials or supplies for the carrying on of such business, shall have a lien upon so much of such property and effects as may have been involved in such business, and all the accessories connected therewith, including the interest of such company, owner or operator in the real estate used in carrying on such business. [The amendment of March 23, 1894, inserted "mine" in first line.]

S. 571, 577, 35 Sup. Ct. 167, 59 L. Ed. ——. We see nothing arbitrary or unreasonable in preferring materialmen, whose supplies enter into the marketed product, over sellers of machinery, upon which liens for the purchase price may well be reserved, or over those loaning money, who not infrequently are in position to exact personal security or indorsement, nor in either of the other respects complained of. We cite in the margin several decisions of the Supreme Court which we think amply sustain the validity of this statute against the criticisms urged.[2] The statute in no way conflicts with the Bankruptcy Act. Section 64b of the act provides that:

"The debts to have priority, except as herein provided, and to be paid in full out of bankrupt estates, and the order of payment shall be: * * * (5) debts owing to any person who by the laws of the states or the United States is entitled to priority."

It was expressly held by this court in the Bennett Case that this section of the Bankruptcy Act adopts the Kentucky statute in question, and makes it the applicable federal law in determining priorities. 153 Fed. at page 674, 82 C. C. A. 531.

[4] 2. The proposition that the statute relates to manufacturing establishments only of the class of rolling mills and foundries, invokes the doctrine of ejusdem generis. We think this question should be regarded as foreclosed against appellant's contention by the repeated decisions of the Court of Appeals of Kentucky and of this court, extending over a period of several years. In Winter v. Howell's Assignee (1900) 109 Ky. 163, 58 S. W. 591, the statute was applied to the case of one whose business was the sale of mixed paints and the manufacture of a cut-off for a cistern. In Graham v. Magann Fawke Lumber Co., 118 Ky. 192, 80 S. W. 799, 4 Ann. Cas. 1026, and in Bogard v. Tyler, 119 Ky. 637, 55 S. W. 709, it was held that a sawmill was a manufacturing establishment within the meaning of this statute. In Hall & Son v. Guthrie's Sons (Ky.) 103 S. W. 721, a flouring mill was held to be a manufacturing establishment within the same statute. In the case of In re Bennett, 153 Fed. 673, 82 C. C. A. 531, the priority provided by the statute was applied by this court in the case of a manufacturer of barrels in favor of the seller of heading and staves; and in Re Starks-Ullman Saddlery Co. (1909) 171 Fed. 834, 96 C. C. A. 506, the statute was held by this court to apply to the manufacture of harnesses, bridles, and other horse leather goods. True, in the Bennett Case the application of the statute was not directly discussed; but in the later case of Starks-Ullman Saddlery Co. it was said of the claims involved in the Bennett Case that they "were indisputably for materials and supplies furnished for the 'carrying on' of an indisputable manufacturing business." 171 Fed. at page 835, 96 C. C. A. at

[2] Tullis v. Lake Erie & Western R. R. Co., 175 U. S. 348, 20 Sup. Ct. 136, 44 L. Ed. 192; Minnesota Iron Co. v. Kline, 199 U. S. 593, 26 Sup. Ct. 159, 50 L. Ed. 322; Louisville & Nashville Ry. Co. v. Melton, 218 U. S. 36, 30 Sup. Ct. 676, 54 L. Ed. 921; Aluminum Co. v. Ramsey, 222 U. S. 251, 32 Sup. Ct. 76, 56 L. Ed. 185; Barrett v. Indiana, 229 U. S. 26, 33 Sup. Ct. 692, 57 L. Ed. 1050; Singer Sewing Mach. Co. v. Brickell, 233 U. S. 304, 34 Sup. Ct. 493, 58 L. Ed. 974; Easterling Lumber Co. v. Pierce, 235 U. S. 380, 35 Sup. Ct. 133, 59 L. Ed. ——.

page 507. It is true that in none of the cases cited was the doctrine of ejusdem generis referred to; but that rule is merely an aid in determining legislative intent, and each of the decisions referred to necessarily involved the finding of legislative intent as including the establishments held respectively to be included within the "manufacturing establishments" of the statute, and so is necessarily inconsistent with the construction here urged. That the reason here assigned for finding a different legislative intent was not mentioned in the opinions referred to would not, in view of the language and history of the statute, justify us in reaching a different conclusion. The fact that since the disposition of this case below the Legislature of Kentucky has amended the statute by the omission of manufacturing establishments does not, in our opinion, affect the question of legislative intent in the passage of this act 30 years or more previous to such amendment.

[5] 3. The remaining question, viz., whether the bankrupt's business was that of manufacturing, presents greater difficulties. The subject was elaborately discussed below by Judge Cochran, in an opinion reported as In re Rheinstrom & Sons Co., 207 Fed. 119. The purpose of the bankrupt's business, as stated in its articles of incorporation, is "buying, selling, dealing, preserving, and packing fruits, vegetables, fruit products, and similar articles, in the state of Ohio and elsewhere." Its actual business was confined to putting up and selling what are popularly known on the market as "Maraschino cherries," but which were not actually such.

According to the record here, the real Maraschino cherry is grown in Dalmatia, Austria.[3] The cherries used by the bankrupt were large, white-meated, free stone cherries, grown in Greece or Italy; they were packed with the stems on, bleached by a sulphuring process, and finally placed in casks, where they were immersed in a solution of brine and sulphurous acid, to prevent fermentation and spoiling while in transit. The treatment up to this point was done by the foreign grower. The bankrupt purchased the cherries in the condition stated. At the bankrupt's establishment the casks were emptied, the cherries washed in various changes of water to effectually remove the brine and acid. They were then stemmed by hand, then pitted by machinery, then washed again in various changes of water to remove any trace of brine or acid which might have penetrated the meat of the cherry. The washings consumed about 24 hours, their object being to restore the cherries as nearly as possible to their condition before packing in the brine and acid solution. The cherries were then colored either red or green by immersion in a coloring solution, then sweetened by immersion in a syrup of cane sugar and water contained in vacuum kettles, where they were kept hot for 12 hours, and boiled for from 24 to 48 hours. They were then flavored by adding to the syrup the desired flavoring substance, were then sorted and graded, and then put into

---

[3] According to the Century Dictionary, "Marasca" is the name of the cherry, "Maraschino" that of the cordial distilled therefrom or flavored therewith. The difference, however, is immaterial to the reasoning or the conclusion of this opinion.

bottles or other containers, which were labeled and shipped by the bankrupt to its customers. The entire treatment in the bankrupt's establishment took six days. A part of the product was flavored with true "Maraschino" water made from real Dalmatian cherries. Another part was flavored with Marasque water, made from cherries grown in Southern France, and being an imitation of the real Maraschino water. The red ones were large and luscious, and until 1911 had been labeled "Maraschino cherries," by which name they were popularly known. Since the taking effect of the Pure Food and Drugs Act in 1911 they were labeled simply as cherries, artificially colored, and, if flavored with real Maraschino water, that fact was stated. This change in labeling has not affected their sale, nor presumably to any extent the name by which they are popularly known. The chief, if not the only, use to which these so-called Maraschino cherries are put is as a garnish in various mixtures of alcoholic liquors, in salads, ice cream, and desserts. Their flavor is not that of the original cherry, nor even that of the real "Maraschino" (or Marasca) cherry.

The specific question is whether the putting up and marketing of these cherries, including their preservation, coloring, and flavoring, so as to produce the articles of commerce known as Maraschino cherries, specially adapted to the use stated, is, properly speaking, manufacture within the Kentucky statute. At the threshold we are met with the proposition that manufacturing necessarily implies transformation, the emerging of a new and different article, bearing a distinct name, character, or use. This general proposition has in numerous cases been declared and applied to the facts and under the conditions involved therein. Appellants insist that it follows from these decisions that the lien here in question must be denied, for the cherries went into the bankrupt's establishment as cherries and came out as cherries, the separate identity of each cherry being retained. We refer to the more important of these decisions.

In Frazee v. Moffitt (C. C.) 18 Fed. 584, Judge Blatchford, then on the circuit bench, held that baled hay was not manufactured, within the section of the statute providing for a duty "on all articles manufactured in whole or in part, not herein enumerated or provided for," notwithstanding in the process of making hay the starch and gluten contained in the grass was converted into sugar; saying (18 Fed. at page 587):

"The substance of dried grass or hay is still grass. Change of name and manipulation do not necessarily constitute manufacture, within the meaning of section 2516."

In Hartranft v. Wiegmann, 121 U. S. 609, 7 Sup. Ct. 1240, 30 L. Ed. 1012, it was held in an opinion by Judge (then Mr. Justice) Blatchford, that shells cleaned by acid and then ground on a metal wheel, some of them afterward etched by acid, and all intended to be sold for ornaments as shells, were not dutiable as "manufactures of shells" under the Tariff Act then in force, but were exempt from duty as "shells of every description, not manufactured." In the course of the opinion it was said of the shells in question:

"They were still shells. They had not been manufactured into a new and different article, having a distinctive name, character, or use from that of a shell."

In Anheuser-Busch Brewing Ass'n v. United States, 207 U. S. 556, 28 Sup. Ct. 204, 52 L. Ed. 336, it was held, in an opinion by Mr. Justice McKenna, that the treatment of corks by a manufacturer and exporter of beer, by way of sterilizing them and closing the seams, holes, and crevices, so as to adapt them for export use, did not entitle the manufacturer to the drawback allowed by the Tariff Act on imported raw material used in the manufacture or production of articles in the United States; it being held that such treatment of the corks was merely incidental to the preparation and bottling of beer for market. It was there said that something more than "treatment, labor, and manipulation" are necessary to "manufacture." "There must be a transformation; a new and different article must emerge, 'having a distinctive name, character, or use.' This cannot be said of the corks in question. A cork put through the claimant's process is still a cork. The process is the preparation of the encasement of the beer," etc.

There is also a group of cases involving statutory exemptions from taxation or license charges, some of which are relied upon by appellants. In City of New Orleans v. Mannessier, 32 La. Ann. 1075, it was held that an ice cream confectioner is not a *manufacturer* in the sense of the law which exempts the latter from taxation. The case involved liability for a license on the business of peddling ice cream on the streets. The exemption was claimed by virtue of a statute prohibiting municipal corporations from levying taxes on "persons engaged in selling articles of their own manufacture, manufactured in this state." The court said:

"The attempt to magnify a confectionery, which is defendant's business, into a manufacture, must fail."

In City v. Coffee Co., 46 La. Ann. 86, 14 South. 502, it was held that a corporation, which by careful and cleanly roasting and a secret process of cooling produced "brands" of unground roasted coffees, each of which was claimed to have a recognizable taste, was not a "manufacturer," within the meaning of the exemption provision of the Constitution. A somewhat similar holding was had in People v. Roberts, 145 N. Y. 375, 40 N. E. 7, as applied to the business of mixing tea, roasting and grinding coffee, and packaging spices and baking powders.

In People v. Knickerbocker Ice Co., 99 N. Y. 181, 1 N. E. 669, and Hittinger v. Westford, 135 Mass. 258, it was held that the cutting, storage, preserving, and selling of natural ice was not manufacture. Doubtless a different rule would be applied to the making of artificial ice. Atty. Gen. v. Lorman, 59 Mich. 157, 26 N. W. 311, 60 Am. Rep. 287.

In People v. Roberts, 155 N. Y. 408, 50 N. E. 53, 41 L. R. A. 228, it was held that a corporation engaged in the business of slaughtering sheep and lambs, refrigerating and shipping meat, selling the hides and wool therefrom, and converting the offal into fertilizer, was not "carrying on manufacture" within the exemption statute. (A contrary conclusion was reached by the Supreme Court of Ohio, in Engle v.

Sohn, 41 Ohio St. 691, 52 Am. Rep. 103, and persons, engaged in the slaughtering and packing of pork and the rendering of lard have been held to be manufacturers under the Internal Revenue Act. See 9 Int. Rev. Record, 193.)

In Standard Tailoring Co. v. City of Louisville, 152 Ky. 504, 153 S. W. 764, 44 L. R. A. (N. S.) 303, a tailoring company, which distrib-- uted samples of cloth among local dealers, who had prospective pur- chasers select the goods, the selection being sent to the company, to- gether with the purchaser's measurements or figure, whereupon clothing was manufactured and sold to the merchant to be resold by him, was held not to be a manufacturing establishment within the meaning of a city ordinance passed to induce the location of "more manufacturing establishments within the city," and so exempting such establishments from taxation for a term of years.

In City of Memphis v. St. L. & S. F. R. Co., 183 Fed. 529, 538, 106 C. C. A. 75, this court held that a cotton compress was not a "manu- facturing plant" within the meaning of a statute authorizing a railroad company to build lateral roads not exceeding a certain length "to any mill, quarry, mine, manufacturing plant," etc.

Whatever conclusion the cases cited may lead to in the disposition of the instant case, each of them is distinguishable from the case before us. Of the tariff cases generally it may be said that the question of classification is usually more or less technical, frequently depending upon comparison of different schedules. The hay case (Frazee v. Mof- fitt) and the shell case (Hartranft v. Weigmann) must be read in the light of the well-settled rule that doubts are resolved in favor of the importer, because "duties are never imposed on the citizens upon vague or doubtful interpretations." Hartranft v. Weigmann, supra, 121 U. S. at page 616, 7 Sup. Ct. at page 1244, 30 L. Ed. 1012.

Frazee v. Moffitt (the hay case) was cited with approval by the Su- preme Court in Hartranft v. Weigmann and Brewing Ass'n v. United States, and by this court in Memphis v. Railroad Co., supra, and has been similarly cited by other courts. But, as respects the case itself, it may be open to doubt whether its doctrine would be applied to one whose sole business affirmatively appeared to be the cutting, curing, and baling of hay for the market, as distinguished from hay which may have been and usually is made as incident to the general business of farming. As to the corks, in Brewing Ass'n v. United States, they were merely cleansed and coated as an incident to preparing beer for export. Such treatment, while improving the corks, gave them no "dis- tinctive name, character, or use."

The cases involving exemption from taxation are, as a class, sub- ject to the rule thus tersely stated in Jones Bros. v. City of Louisville, 142 Ky. 759, 135 S. W. 301:

"The right of taxation is never presumed to be relinquished, and before any party can rightly claim an exemption from the common burden it is in- cumbent upon the party to show affirmatively that the exemption claimed is authorized by law. If there be a doubt upon the subject, that doubt must be resolved in favor of the state, and it is only where the exemption is shown to be granted in terms clear and unequivocal that the right of exemption can be maintained."

There is nothing in the coffee, tea, and ice cases (46 La. Ann. 86, 14 South. 502; 145 N. Y. 375, 40 N. E. 7; 99 N. Y. 181, 1 N. E. 669; and 135 Mass. 258) at all inconsistent with the classification of the industry here in question as a manufacture. The ice cream case (32 La. Ann. 1075) was cited in the Standard Tailoring Company Case; but here again it is at least fairly open to question whether that ruling would be applied to one whose sole business was the manufacture and vending at wholesale of ice cream. This doubt is strengthened by the later decisions of the Supreme Court of Louisiana in City v. Ernst & Co., 35 La. Ann. 746, State v. Eckendorf, 46 La. Ann. 131, 14 South. 518, and State v. American Sugar Refining Co., 108 La. 603, 32 South. 965. The cotton compress case (183 Fed. 529, 106 C. C. A. 75) has in itself little, if any, pertinency here, as compressing cotton is merely packing it; and the construction of the ordinance there in question is clearly subject to the rule that municipal grants of franchises or privileges in which the public are interested are to be construed strictly in favor of the public, and that nothing passes by implication which is not granted in clear and explicit terms. Knoxville Water Co. v. Knoxville, 200 U. S. 22, 24, 26 Sup. Ct. 224, 50 L. Ed. 353; Blair v. Chicago, 201 U. S. 401, 26 Sup. Ct. 427, 50 L. Ed. 801; Cleveland Elec. Ry. Co. v. Cleveland, 204 U. S. 116, 120, 27 Sup. Ct. 202, 51 L. Ed. 399. Indeed, the making of sheets of "batting" from cotton has been held manufacturing under the Internal Revenue Laws. 5 Int. Rev. Record, 180.

On the other hand, statutes of the nature of the Kentucky lien law before us belong to the general class of remedial statutes; and while the courts were at one time inclined to hold that such statutes, being in derogation of the common law, must always be strictly construed, there has been a noticeable relaxation in favor of a more liberal construction, for the purpose of effecting the beneficent purposes of such legislation. The federal Safety Appliance Act is, in this view liberally construed. Johnson v. So. Pac. R. R. Co., 196 U. S. 1, 17, 25 Sup. Ct. 158, 49 L. Ed. 363; Schlemmer v. Buffalo, etc., Ry. Co., 205 U. S. 1, 27 Sup. Ct. 407, 51 L. Ed. 681; Southern Ry. Co. v. Snyder (C. C. A. 6) 187 Fed. 492, 495, 109 C. C. A. 344. State statutes granting exemption of property from liability for debt have been liberally enforced in bankruptcy administration (In re National Grocer Co. [C. C. A. 6] 181 Fed. 33, 104 C. C. A. 47, 30 L. R. A. [N. S.] 982), and a state statute granting the widow and children support from the estate of the deceased for a definite period has been held applicable when bankruptcy occurs before death (Hull v. Dicks, 235 U. S. 584, 35 Sup. Ct. 152, 59 L. Ed. ——). The Michigan statute giving a lien for labor upon logs has been held entitled to a liberal construction to effectuate the object of providing additional security to the laborer. Shaw v. Bradley, 59 Mich. 199, 209, 26 N. W. 331. So, in respect to statutes giving liens to mechanics and materialmen, there is a pronounced tendency toward liberality of construction.

[6] It is "a sound rule of construction that a statute giving a lien is regarded as a remedial statute, and is to be liberally construed, so as to give full effect to the remedy, in view of the beneficial purpose contemplated by it." 1 Jones on Liens, § 1005. See, also, Smalley v.

Terra Cotta Co., 113 Mich. 141, 146, 71 N. W. 466; De Witt v. Smith, 63 Mo. 263; Maynard v. Ivey, 21 Nev. 241, 29 Pac. 1090; Bullock v. Horn, 44 Ohio St. 420, 7 N. E. 737; Godfrey Lumber Co. v. Kline, 167 Mich. 629, 632, 133 N. W. 528. And although no one is to be included "by strained construction" (Thompson v. Baxter, 92 Tenn. 305, 21 S. W. 668, 36 Am. St. Rep. 85), and "the courts cannot extend a statute to meet cases for which the statute does not provide, though those cases may be of equal merit with those provided for" (1 Jones on Liens, § 105); and although there are cases (such as May, etc., Brick Co. v. Engineering Co., 180 Ill. 535, 54 N. E. 638) still holding to the theory of strict construction, as well as others making the distinction that, "upon the question whether a lien attaches at all, a strict construction is proper" (2 Jones on Liens, § 1554; Lacy v. Power & Heat Co., 157 Mich. 544, 546, 122 N. W. 112, 133 Am. St. Rep. 360), as distinguished from the liberal construction to be applied after the lien has once attached, yet the generally prevailing rule falls short, we think, of the very strict rule pertaining to the construction of tariff and tax exemption statutes.

Apart, however, from any question of liberal construction of lien statutes generally, we think it entirely safe to say that the tendency of modern decision has been to appreciably expand the formerly prevailing definition of "manufacture." In Tidewater Oil Co. v. United States, 171 U. S. 210, 216, 18 Sup. Ct. 837, 43 L. Ed. 139, Mr. Justice Brown, in applying the term "manufacture" in a tariff drawback case, said that the word "is now ordinarily used to denote an article upon the material of which labor has been expended to make the finished product." In Friday v. Hall & Co., 216 U. S. 449, 454, 30 Sup. Ct. 261, 262 (54 L. Ed. 562, 26 L. R. A. [N. S.] 475), Mr. Justice Lurton spoke of this definition as an "expansion of the meaning of the word 'manufacture'"; and in that case this expanded definition was applied to the term "manufacturing" as used in the fourth section of the Bankruptcy Act, Mr. Justice Lurton saying:

"Undoubtedly Congress intended that that class of business corporations engaged in any class of manufacturing, as its principal business, *and not as a mere minor incident to some larger work*,[4] should be subject to the law; and this intention should be regarded by giving to doubtful words and terms a liberal rather than a narrow meaning. 'Manufacturing' has no technical meaning. It is not limited by the means used in making, nor by the kind of product produced. In Kidd v. Pearson, 128 U. S. 1, 20 [9 Sup. Ct. 6, 10 (32 L. Ed. 346)], Mr. Justice Field said that 'manufacture is transformation, the finishing of raw material into a change of form or use.'"

And in the Friday Case this expanded definition of manufacture was held to cover a corporation organized to construct railroads, buildings, and other structures, including arches, walls, and bridges from concrete, although the materials used in making were combined, and the labor, machinery, and materials supplied at the place of construction called for by the contract. And this court, in Columbia Iron Works v. National Lead Co., 127 Fed. 99, 62 C. C. A. 99, 64 L. R. A. 645, held that a corporation engaged principally in the business of building and

---

[4] Italics ours.

repairing large steel ships for sale and upon order was engaged in manufacturing. This case was cited with approval in the Friday Case. The business of the bankrupt here was clearly manufacturing within section 4 of the Bankruptcy Act.

We find nothing in the Kentucky decisions supporting the limited construction of "manufacturing" contended for by appellants. It is true that in Bogard v. Tyler, 119 Ky. 637, 55 S. W. 709, in which a sawmill was held to be a manufacturing establishment, it was said that, "the lien being statutory, all the conditions upon which it is predicated must exist"; but this statement suggests no unusual strictness of construction. Again, Muir v. Samuels, 110 Ky. 605, 62 S. W. 481, holds that a laundry is not a manufacturing establishment within the meaning of the lien statute involved here. It was there aptly said that "the only business of a laundry is to transform soiled into clean linen." In the Tailoring Company Case, where Jones v. Louisville and other cases asserting the strictness of construction to be applied to tax exemption statutes are cited and quoted from at length, it was said (152 Ky. 505, 153 S. W. 765 [44 L. R. A. (N. S.) 303]) that "the words 'manufacturing establishment' have been given a variety of meanings, depending largely on the circumstances surrounding the case in which they have been used. The result of this is that, although the words have been often defined by the courts, few judicial precedents can be found that may be properly applied to any particular state of facts"; and after stating the dictionary definition of the term, the court goes on to say (152 Ky. 506, 153 S. W. 765 [44 L. R. A. (N. S.) 303]) that in applying that definition "to the facts of particular cases, in which the construction of statutes or ordinances were involved, the courts, especially in license and exemption cases, have found it necessary in carrying out the legislative intent in the use of the word [manufacture] to materially limit the scope" of the general definition, and that "indeed we might say that the meaning of the words 'manufacture' and 'manufacturing establishment' has been adapted to meet the varying circumstances arising in the case or classes of cases in which it was necessary to define them, so that the intent with which they were used might be accomplished. The purpose of the lawmaking body in using the words has always been allowed to have controlling weight in the decision of the meaning that should be attached to them," etc. In denying the exemption there claimed, the court seems to have been strongly impressed with the consequences which would result from allowing the exemption, as resulting in the inclusion of all merchant tailors, milliners, dressmakers, bakers, confectioners, shoemakers, carpenters, cabinetmakers, "and all other persons who are engaged in converting articles from one form into another."

In common parlance, the bankrupt's establishment would ordinarily be called a factory. Canning factories and pickle factories are well known in common speech. Considering the purpose of the statute, we think it more natural to conclude that the Legislature used the term "manufacturing establishment" in its ordinary sense, rather than in its technical meaning, as used in relations to which the object of the statute is entirely foreign, viz., tariff cases and tax exemptions.

Certain dicta are cited as leading to a contrary conclusion. Thus Frazee v. Moffitt contains the dictum that "dried apples would not be called a manufactured article though the apple is peeled and cored and sliced, and dried by exposure to the sun and manipulation"; but assuming that this is true of domestic apple drying as conducted 30 years ago, it by no means follows that the same rule would apply to the large factories where fruit is evaporated and bleached for the market, nor to the large canning factories of the present day which play so important a part in the industrial art. In Schlitz Brewing Co. v. United States, 181 U. S. 584, 21 Sup. Ct. 740, 45 L. Ed. 1013, where it was held that the fact that the beer must be steamed after bottling "does not convert a bottle from an encasement into an ingredient," reference was made, by way of illustration, to "certain canned fruits and vegetables which are required to be incased while hot and still in the process of preservation." But we fail to find in this even a dictum that a canning establishment does not "manufacture." On the other hand there are not wanting dicta expressiy recognizing canning factories as manufacturing establishments. See Engle v. Sohn, supra; State v. American Sugar Ref. Co., 108 La. 603, 628, 32 South. 965; In re Alaska American Fish Co. (D. C.) 162 Fed. 498. In the Engle Case (which involved exemption from taxation) "canned fruits" were included in the illustrative category of articles which, "though but slightly changed from the original material, could not, we think, be properly classified as unmanufactured goods." In the Sugar Refining Case, which held that a sugar refinery is a manufactory and is exempt from license taxation it was said that the "canning factories, which prepare fruits and vegetables for future use without changing the identity of the raw material, are manufactories by the very term used to designate them." In the Fish Company Case, a company operating a plant for preparing, preserving, and packing fish, was directly held to be principally engaged in manufacturing within the meaning of the Bankruptcy Act.

The actual business of the bankrupt here was more than mere canning or preserving, and more than mere cooking or coloring; whether the bankrupt was manufacturing "must turn more upon what it was actually doing than upon what it was authorized to do." Friday v. Hall, supra, 216 U. S. page 454, 30 Sup. Ct. 261, 54 L. Ed. 562, 26 L. R. A. (N. S.) 475. Having in mind the change which the bankrupt's process created with respect to distinctive name, character, and use, we are constrained to the view that its establishment which put up the so-called Maraschino cherries was a manufacturing establishment within the Kentucky lien law.

It results from these views that the order complained of should be affirmed, with costs.