## UNITED STATES v. ANDERSON et al.

No. 15267.

District Court, S. D. California, Central Division.

July 17, 1942.

Wm. Fleet Palmer, U. S. Atty., and Maurice Norcop, Asst. U. S. Atty., both of Los Angeles, Cal., for plaintiff.

J. George Ohanneson, of Los Angeles, Cal., for defendants.

YANKWICH, District Judge.

By the indictment, filed on March 4, 1942, three persons, the defendants on trial, Gunard Hubert Anderson, Joseph Aimino, and one Alfred Sackett, were charged with conspiracy to take and carry away and abet and aid in taking and carrying away for their own use, with the intent to steal and purloin the same, property which was being made, manufactured and constructed under contract for the War Department of the United States,—to-wit, scrap aluminum and other usable salvage being made, manufactured and constructed in airplanes by the North American Aviation, Inc., under contract for the War Department of the United States.

Four overt acts were set forth in the indictment:

1. That on or about March 1, 1941, defendant Joseph Aimino received from defendant Gunard Hubert Anderson at Los Angeles, California, the sum of $15.

2. That on or about July 19, 1941, defendants Alfred Sackett and Gunard Hubert Anderson sold to one Finkelstein Foundry Supply Company approximately 1,508 pounds of aluminum at Los Angeles, California.

3. That on or about September 6, 1941, defendants Alfred Sackett and Gunard Hubert Anderson sold to Finkelstein Foundry Supply Company, approximately 1,294 pounds of aluminum at Los Angeles, California.

4. That on or about January 6, 1942, at Los Angeles, California, defendant Gunard Hubert Anderson had in his possession approximately 896 pounds of aluminum rivets.[1]

■■ Ordinarily, in a conspiracy matter, any important question of law relates to the conspiracy itself. This, because the conspiracy is stated plainly in the indictment, the meaning of the law charged to be violated is clear, or the enactment has been on the statute books so long that no question as to its meaning is raised. In a conspiracy case, the conspiracy is the offense. And before a defendant can be convicted, it must be found, beyond a reasonable doubt, that he was a party to the conspiracy and that the unlawful agreement charged continued up to the time when an overt act was committed.

■■ The other element of the offense is the specific intent to promote the common design. This may be inferred from the evidence, and from the acts and declarations of the members of the conspiracy, made while the conspiracy is in progress. The overt act, which must be proved, is any act committed by any one or more of the conspirators which has a tendency to forward its purpose.[2]

Here, however, while these principles still govern the determination of the guilt or innocence of these two defendants, the stress of the whole case is laid upon the object of the conspiracy, namely, the violation of Section 82 of Title 18 of the United States Code Annotated. The section was first enacted in 1909. It was amended in 1918 and in 1938.

■■ It has been before the courts in very few cases. But such courts as have had cases under it, including our own Ninth Circuit Court of Appeals, have held that the object of the section is to introduce the crime of larceny into the Federal Criminal Code.

In Frach v. Mass, 9 Cir., 1939, 106 F.2d 820, 821, we find these words: "Larceny of property of the United States is made a crime by 18 U.S.C.A. § 82."

■■ This means of course, that in interpreting the statute, we may apply the principles governing the common law crime of larceny, as interpreted by the courts of various states.

■■ The most important question in the case is the meaning of the words "property which has been or is being made, manufactured, or constructed under contract for the War or Navy Departments of the United States."

---

[1] The trial before the court without a jury was the second trial. A first trial, *with a jury*, resulted in disagreement.

[2] See my opinion in United States v. Food & Grocery Bureau of Southern California, D.C.Cal.1942, 43 F.Supp. 966, 969, 970.

Originally, the section merely applied to property of the United States or any branch or department of the United States. Then was added, as Government activities expanded, property of corporations in which the United States of America was a stockholder. And, finally, the phrase just given.

During the course of the other trial before a jury, in passing on the admissibility of evidence, I made an elaborate statement of my interpretation of this section. Counsel for the Government have incorporated it in their argument.[3] There is, therefore, no need for re-elaboration here. A summary will suffice.

---

[3] The statement, or rather discussion, alluded to, with certain excisions made for the sake of brevity, is here given:

"The Court: I do not take the view that the property has to be manufactured on the premises. If it is property which has been or is being made, manufactured or constructed under a contract with the United States, it may originate outside. But if it is adaptable to be put into airplanes, it is covered by the statute. Otherwise, one might show a situation like this:

"A company might be an assembling company, which manufactures parts from material which it buys elsewhere, brings them to the plant and puts them together. And it might then be claimed that it is not property being made, manufactured, or constructed under contract with the War or Navy Department.

"The more I think about the meaning of the word 'property', the more I am satisfied that materials which the corporation actually has, which either were going into the plane or could go into the plane by certain processes, are within the purview of the statute. The descriptive words are in the disjunctive.

"It says, 'property which has been * * * made.' That means property which has been finished, like the wing of an airplane, or an airplane.

"Then comes the next phrase, 'being made, manufactured, or constructed.' Each of those words 'made', 'manufactured', or 'constructed' have a distinct meaning. 'Made' means produced artificially. 'Manufactured' comes from the Latin words manus and factura, literally, put together by hand. Now, it means the process of making products by hand or machinery. 'Constructed' means to build; to build a thing out of its constituent elements. Therefore, anything that is capable of being made, manufactured or constructed into a whole is within a statute.

"To demonstrate that, we refer to the word 'property'. Had the Congress meant only finished things, they wouldn't have used 'property'. They would have said, 'property made for the United States,' or 'property completed for the United States'. 'Property' does not necessarily mean a finished thing. 'Property' means anything which is capable of ownership.

"To support this, I have before me Words and Phrases, Fourth Series, 1933. Under the Title 'Property', we find a variety of definitions: 'The term "property", standing alone includes everything that is subject of ownership. It is a nomen generalissimum, extending to every species of valuable right and interest.' (Vol. 3, p. 212, Col. 2 [34 Words and Phrases, Perm.Ed., p. 405]). 'Property in the legal conception, is the total of the rights and powers incident to a thing rather than the thing itself.' * * * 'Property is anything that may be the subject of ownership.' * * * 'Property is the sum of all the rights and powers incident to ownership.' * * * 'Property includes every interest in everything subject to ownership of man and the right to dispose of that interest is "property right".' * * *'

"My view is that rivets which are made to be used in putting parts together are property, whether they are manufactured on the place or bought outside. The question is: Are they capable of being put into property being made, manufactured or constructed under the contract with the United States Government?

"Mr. Ohanneson: May I be heard?

"The Court: Yes.

"Mr. Ohanneson: Reading Section 82, that portion which we are interested in, may I quote: 'Or any property which has been or is being made, manufactured, or constructed under contract for the War or Navy Departments of the United States.' That clearly indicates there are two types of personal property referred to. The first one is a completed article. It says: 'Any property which has been or is being made * * *' In other words, has been made under Government contract. I think it will be considered that the Exhibit now offered in evidence, to-wit, these rivets, are completed articles and if it is a completed article in itself the Section provides:

"It must have been 'constructed under contract for the War or Navy Departments.'

"The Court: By the same token, you would say that nails which are used to

I am of the view that the word "property" in this phrase is used in its broadest sense. Had the Congress intended to confine the offense to property "*owned*" by the United States, there would have been no need to specify property of a corporation in which the United States is a stockholder. Ordinarily, there is no special state law, which makes it a state offense to steal property of a corporation because a particular stockholder owns stock. The larcenous act lies in stealing the property of a corporation, regardless of the interest of a particular stockholder. It is larceny, so long as ownership is in some one else than the thief. But, evidently, in order to avoid the claim

---

put lumber together to build a house are a completed article, and that a man could steal a keg of nails in a barracks that is being built for the United States or on one of the housing projects, and not be within the statute. I say you do not require a finished article. I say also that this section applies to anything capable of being used in the manufacture of armaments under contract. * * *

"Mr. Ohanneson: Of course, we are familiar with the rule that a statute must be strictly construed in favor of the defendant. Now, we have, as you started to say, two types of property referred to in this particular Section. The first one has to do with property which has been made. It is a completed article under contract for the War and Navy Departments. That is what brings it into the Federal Court. My position is that these rivets, Exhibit No. 2 for identification, are completed products coming under the first portion of the Section, and there was no evidence they were built or manufactured under a contract for the War Department.

"The Court: You do not contend that everything which goes into an airplane, for instance, would have to be made at the plant before you could admit that it is being built. A man would have to steal a bomber before he would be guilty of the offense charged.

"Mr. Ohanneson: The charge is the defendant knowingly took property off the premises where they were engaged under contracts to build planes for the Government.

"The Court: That is all they were doing at that plant. * * *

"Mr. Ohanneson: Now, the second portion is: That 'is being made.' That is the present tense. I am not trying to tell the Court the value of grammar. It is in the actual making. Along with the word 'make' it means the actual building—in the process of making it.

"The Court: That is right.

"Mr. Ohanneson: That is the word that is used in the indictment, may it please the Court. The word which they could have used and have not used 'had been made'. They did not see fit to charge him with that. He is charged with taking property in the course of process of its being made. There is nothing about these rivets, about these Exhibits, that they were in the process of being made under contract for the War Department. I know it may seem highly technical. But we have here a peculiar section—at least, to me it is—and I feel that under the indictment it cannot be said that these rivets were in the process of being made and, therefore, do not come within the provision of Section 82, Title 18.

"The Court: Under your construction, only a completed article is covered by the statute. Your chief contention is that property merely capable of being used in the making of any part of the plane is not included. Well, under that theory, of course, an unfinished piece of dural would not constitute 'property', because it is not anything which has taken finished shape or form. It is something which has to be processed further before it can be used. You also say that the material, to be 'property', must have been made or manufactured, and constructed on the place, under the contract. Under that theory, nothing that came from the outside and went into the airplane would be property being manufactured, because it was already manufactured before it got there.

"Mr. Ohanneson: I have two grounds. I have added that, too.

"The Court: I am stating that as your theory—if your theory is correct, there is no offense. But I take the other view, because, under your theory, as I said, they would have to steal an entire bomber before they would be guilty of the offense, or a part that was actually made there on the premises under the contract and completed.

"The Government does not contract for parts of airplanes. It contracts for completed planes. Therefore, under your theory, where it appeared that some parts were taken, they would have to be parts built at the plant. And then your argument would be that it was not manufactured for the United States.

"If I concede that, then you would say it is only a part and not the whole. And, because the contract is for the building of a whole airplane, there was no offense. Therefore, ultimately, under

that only property which is in the absolute ownership of the United States could be the subject of this crime, the Congress included property belonging to a corporation in which the United States is a stockholder. They did not say a *sole* stockholder or *even a majority* stockholder. But they did not stop there. They added: "or any property which has been or is being made, manufactured, or constructed", etc.

We, thus, have two kinds of property which come within the purview of the statute, so far as this case is concerned.

First, property which has already been made, manufactured or constructed under contract for the War or Navy Departments of the United States. That would mean a *completed thing,*—an airplane, a ship, a gun.

The alternative phrasing "which * * * is being made, manufactured, or constructed", etc., would be meaningless, if we interpreted the enactment as referring only to a *completed thing.*

They intended by these words to cover something else. The beginning of the section, in its original form, had already included all *property* belonging to the United States. The obvious interpretation of the section, therefore, is that when they said, *in the alternative,* "or is being made, manufactured, or constructed under contract for the War or Navy Departments of the United States", they intended to include something less than a completed article, —something incomplete, which was, for the moment, under the control of the person making it, manufacturing it or constructing·

your contention, you are right, whichever view you take.

"Mr. Ohanneson: That is why I contend the Government has no case either way. My position is that it cannot be said the taking of these rivets is a violation because it is not under a contract with the Government.

"The Court: Of course, that is only a part. The Government is relying on other parts, and the statement I made is correct in delineating what the issue is. But I have ruled consistently, throughout the trial, that it was not necessary for a thing to be completed. The question of where it was manufactured was not brought up. It is a new idea, anyway. Now, if you dismantle the airplane and take out the engines or you steal an engine, you are right again, for the contract is not to manufacture the engine, but to manfacture the plane.

"Mr. Ohanneson: It is in the process, the building of the wings as you referred to, and the engine or any other portions of an airplane is a part of the building or process of building this plane.

"The Court: So are rivets.

"Mr. Ohanneson: Rivets are completed articles,—complete in themselves and purchased some place else.

"The Court: A nail is not a completed article. It is a functional article.

"Mr. Ohanneson: It is complete in itself.

"The Court: It may be a nuisance, if you step on one, and it becomes a useful article, if you use it to put two pieces of timber together.

"Mr. Ohanneson: But in some fashion —in so far as the article itself is concerned, it is completed because it can be used in the type of airplanes they are going to build.

"The Court: I hold that any completed article like a rivet which has been brought to the plant and is held available to be used in the manufacture of an airplane under contract with the United States, is within the contemplation of the statute, as well as any matter or material which is being held there to be processed and put into the airplane. And there is no difference between things that are amorphous, shapeless, like dural and a rivet, which, of itself, has no use except when used to tie together sheets of metal in an airplane.

"Mr. Ohanneson: Does the Court make a statement that, regardless whether or not the rivets were constructed under contract with the Government—

"The Court: I will make the statement that it is not necessary, before admitting the rivets or other materials which are charged in the indictment. That is not limited to completed articles, to the airplanes which are being manufactured under the contract. The indictment covers every article which may be designated as 'property', which, either in the form in which it is, or, after additional tooling and processing, is intended to be used in the construction of an airplane under contract with the United States Government.

"Now, that is my interpretation of the section of the law and, therefore, it is immaterial whether the property which it is alleged the defendants conspired to take, consists of rivets which may have been manufactured on the outside and brought to the plant to be used, and which were, actually, used on a plane, or in constructing a part on an airplane, being made under contract with the United States Government." (Transcript, pp. 441 to 453.)

it for the United States, and in which either the War or Navy Department had an interest, arising through contract.

█ The words "made, manufactured, or constructed" cover almost everything which the skill of man can make out of raw materials. They have been given the broadest meaning by courts[4]. The word "property" also requires a broad construction.

Generally, "property" expresses the sum of all the rights and powers incident to ownership. It includes any interest in anything which may be the subject of ownership and the right to dispose of such interest.[5]

The words "property * * * being made, manufactured, or constructed", would lack meaning, if I held that the only property which is the subject of this section is "property" which has passed into the ownership of the United States, because that is covered by the original section.

If we say that these words mean that there must have been a manufactured part, such as a wing or part of the fuselage or an engine or any other completed equipment, *actually manufactured on the place,* we limit the scope of the section, unjustifiably.

█ I think that what the Congress sought, by the section, was to protect the rights of the Government in property which had either been completed or was being held for delivery for the United States, or property as well as materials which were in the process of being made, manufactured or constructed into parts for completed objects under contract with the Navy or War Department of the United States. Of necessity, therefore, pieces of dural, so important in the construction of airplanes, and which as the testimony shows indisputably, could be turned into parts by the machine shops in the plant of North American Aviation, Inc., are clearly within the statute. We have the testimony of the foreman of the machine shop of the Aviation Company that several different parts, such as a nose wheel timing valve, which is Exhibit 32, a swivel pin, which is Exhibit 33, Exhibit 34, the designation for which escapes me, could be made out of the pieces of dural taken by the defendant, and be incorporated into an airplane. The same is also true of Exhibit 31, a system exhaust valve. Exhibit 35 is a retainer for air emergency air brake valves, and Exhibit 36 resembles an ordinary large valve about an inch and a half wide. All are usable parts.

█ I am of the opinion that when a manufacturer is in the process of constructing, making or manufacturing a thing, not only the finished object, but also the raw material which is held available for its construction, is within the designation of "property * * * being made, manufactured, or constructed." This conclusion

---

4 See Friday v. Hall & Kaul Co., 1910, 216 U.S. 449, 30 S.Ct. 261, 54 L.Ed. 562, 26 L.R.A.,N.S., 475; International Mausoleum Co. v. Sievert, 6 Cir., 1914, 213 F. 225, 226–229; Central Trust Co. of Illinois v. George Lueders & Co., 6 Cir., 1915, 221 F. 829, 838, 840. American Patents Dev. Corp. v. Carbice Corporation, 2 Cir., 1930, 38 F.2d 62; United States v. Armature Exchange, Inc., 9 Cir., 1941, 116 F.2d 969.

5 To the cases referred to in the discussion, at the former trial, which is reproduced in Note 3, there may be added certain federal cases which, to my mind, make the interpretation placed here on the word "property" inevitable. In the dissenting opinion in Scranton v. Wheeler, 1900, 179 U.S. 141, 170, 21 S.Ct. 48, 59, 45 L.Ed. 126, we find this definition of the word "property":

"The term 'property,' standing alone, includes everything that is the subject of ownership. It is a nomen generalissimum, extending to every species of valuable right and interest, including things real and personal, easements, franchises, and other incorporeal hereditaments. Boston & L. R. Corp. v. Salem & L. R. Co., 2 Gray [Mass., 1], 35, Shaw, C. J."

This definition from an old opinion by Chief Justice Shaw of Massachusetts (Boston & L. R. Corp. v. Salem & L. R. Co., 1854, 2 Gray, Mass., 1, 35) has been accepted in subsequent federal cases. Among the more recent cases which quote it or refer to it are Lucas v. Schneider, 6 Cir., 1931, 47 F.2d 1006–1008; In Hoyd v. Citizens Bank of Albany Co., 6 Cir., 1937, 89 F.2d 105, 107, in defining the word "property" as generally used, the Court says:

"The term 'property' is not defined in the enactment. It is unlimited by any qualifying phrase, and doubtless was used in its ordinary sense as interpreted in the various decisions of the federal and state courts. Property is a nomen generalissimum and extends to every species of valuable right and interest, including real and personal property, easements, franchises, and other incorporeal hereditaments."

leaves very little to be added by way of comment on the facts. The evidence shows clearly that large pieces of dural, which came under the designation of salvage, and which were designated as acceptable material in the contract between Anderson and the Aviation Company, were taken from the plant, as a result of a conspiracy between him and the defendants Aimino and Sackett.

In view of Sackett's plea of nolo contendere, his connection with the case has not been gone into fully. It was also unimportant, except to indicate that he agreed to a false bookkeeping system to cover up the large amount of dural which was coming through.

■ Even if we eliminate the admissions, which were limited to each defendant in the case, the evidence indicates clearly a conspiracy on the part of Anderson and Aimino to achieve the illegal object —namely, the taking and carrying away of property being made, manufactured and constructed under contract with the War Department.

Anderson and Aimino admitted, in their statements, facts which indicate a conspiracy to achieve what was known to both of them to be unlawful object.

■ Aimino admits that he received money for placing in the bottom of the barrels large pieces of dural, so that they would not be noticeable, that he received pay for this, that he kept increasing his demands, and that they were always met over a period of a year and a half. Only when he was advanced to a higher position (lead man) did his conscience begin to hurt him. Even then, he did not go to the authorities and tell them that a large amount of valuable material had been taken out, contrary to law, and to the agreement under which Anderson operated, the terms of which he knew.

The law recognizes, as does religion, a locus pœnitentiae,—a place or opportunity to repent,—but neither law nor religion forgives the crime or wrong, unless convinced that there is actual repentance.

Aimino could have shown repentance by informing the proper authorities of the wrong committed, even at the risk of implicating himself. This he did not do.

And as to Anderson, even eliminating the confession, there is a set of circumstances which shows beyond doubt that the transaction reeks of fraud and criminal intent from beginning to end. We have faked books, fictitious invoices,—prepared at his request—falsified bookkeeping and concealment of payments to Aimino and others, who were aiding, on the inside or out, by making payments through Anderson's wife, who was a part of the conspiracy, although not prosecuted.[6]

And then there were directions to employees to conceal the exact amount of salvage being taken out. Counsel say that, at best, this is a civil matter between Anderson and the Aviation Company. It is not such.

■ If an employee should take twenty-five cents out of a "petty cash" box, and, when discovery occurs, should state that, needing carfare or lunch money, he took it, intending to return it, but forgot, the plea might be plausible. But if the same employee should, over a period of years, misappropriate his employer's property, we would have an entirely different situation. So here, if it appeared that, occasionally, a piece or two of material appeared in the buggies carrying the waste, which Anderson did not return, the incident might be considered accidental, rather than criminal. But when we find that thousands of dollars' worth of usable material was turned in to Anderson—when it appears from his declarations to others, even if we exclude the confession or admission,—that he knew that he was not entitled to the material, and consider also the large quantity of material found in his salvage yard, then the suggestion of his counsel that he took it until he had the time to decide whether it was to be returned or not, is rather fantastic. For these acts all spell a criminal purpose. As this is a common-law crime, we may well advert to some state court decisions which hold, generally, that

---

[6] Despite modern woman's insistence on complete egalitarianism, we are still, even in the enforcement of the criminal laws of the country, partial to her. We still prefer to blame husbands for the delinquencies of wives, and assume that a married woman, who associated in a criminal act with her husband, must have done so under his coercion or at his behest, and blame him, alone. Call it generosity, Chivalry or even the manifestation of man's egotistical, protective instinct. It remains a fact, which the fullest realization of "equal rights" will not affect.

possession of stolen property, immediately after it is stolen, if unexplained, warrants an inference of guilt. The California District Court of Appeal, Third Appellate District, said in People v. Nichols, 1918, 39 Cal.App. 29, 34, 177 P. 861, 863:

"In other words, such possession, unexplained, merely affords, if any at all, a very remote inference of guilt, and whether such inference may acquire any probative significance or evidentiary value in the establishment of the guilt of the accused must depend upon the character or nature of other incriminatory circumstances, if any be shown."

In People v. Majors, 1920, 47 Cal.App. 374, 375, 190 P. 636, 637, the Second Appellate District said:

"Conceding that mere possession by defendant of the stolen property after the time of the burglary would not be sufficient to warrant his conviction, it seems clear that such possession, taken together with his sale of the property, under a false name and for a grossly inadequate price, in the absence of any explanation—and none appears—are circumstances quite sufficient to sustain the verdict."

This view is also supported by People v. Haack, 1927, 86 Cal.App. 390, 398, 399, 260 P. 913.[7]

I need not comment again on the evidence which may be considered under this principle. In what precedes, I have indicated the many unexplained actions of the defendants and the inferences to be drawn from them. I add that the evidence shows the existence of a conspiracy between the two defendants and Sackett. There is ample evidence to show the participation of all three defendants in the conspiracy. Anderson, of course, was the head and front of the offending, because he was the only one who had authority to take out any waste.[8]

There is abundant evidence to show that this entire set-up was intentional,—a delib-

---

[7] This is the general view, recognized by practically all states in the United States which follow the common law criminal jurisprudence. See 32 Am. Juris., Larceny #129, pp. 1039, 1040. It is also the view of the federal courts which have had occasion to interpret statutes of the character under consideration. See Wilson v. United States, 1896, 162 U.S. 613, 619, 620, 16 S.Ct. 895, 40 L.Ed. 1090; Rossi v. United States, 1933, 289 U.S. 89, 91, 92, 53 S. Ct. 532, 77 L.Ed. 1051; Rosen v. United States, 2 Cir., 1920, 271 F. 651, 655; Boehm v. United States, 2 Cir., 1921, 271 F. 454, 455; Weisman v. United States, 8 Cir., 1924, 1 F.2d 696, 698; Bruce v. United States, 8 Cir., 1934, 73 F.2d 972, 973, 974; Niederluecke v. United States, 8 Cir., 1931, 47 F.2d 888, 889. In United States v. Seeman, 2 Cir., 1940, 115 F.2d 371, 374, the principle was applied to a prosecution for conspiracy to transport stolen bonds in interstate commerce. Judge Augustus J. Hand used this language, which covers very aptly the situation here:

"The proof was considerably stronger than in many cases where a conviction has been sustained, for here there was much more than possession by the conspirators of stolen securities. There was ample proof of a plan in which the appellant was engaged both to procure such securities and also to share in the profits derived from their sale. Boehm v. United States, 2 Cir., 271 F. 454; Rosen v. United States, 2 Cir., 271 F. 651; Drew v. United States, 2 Cir., 27 F.2d 715; United States v. Di Carlo, 2 Cir., 64 F.2d 15."

Some of these cases state the principle in terms less favorable to the defendant than the California cases referred to in the body of the opinion. Thus, Mr. Chief Justice Fuller, in Wilson v. United States, supra, at page 619 of 162 U.S., at page 898 of 16 S.Ct., 40 L.Ed. 1090, goes so far as to consider possession, if unexplained, as prima facie evidence of guilt:

"Possession of the fruits of crime, recently after its commission, justifies the inference that the possession is guilty possession and, though only prima facie evidence of guilt, may be of controlling weight, unless explained by the circumstances or accounted for in some way consistent with innocence."

Under these cases, as the defendant Anderson did not take the stand to explain his possession, I could have drawn stronger inferences than I did.

[8] The chief object of the opinion, delivered in open court, was to give the court's legal interpretation of the portion of Section 82, Title 18 U.S.C.A., under which the indictment was returned. This does not seem to have been interpreted in any opinion which has seen publication. So, the aim of the court was to state its views on the fundamental legal questions involved. And while the facts given in the opinion are adequate, it might be well to add, for their better understanding, some others, which appear in the record. The defendant Anderson was an employee of North American Avi-

erate conspiracy designed to steal property which was being made, manufactured or constructed *under contract* with the War Department, and thereby to violate Section 82, Title 18 U.S.C.A.

Hence the verdict:

I find the defendants Gunard Hubert Anderson and Joseph Aimino, and each of them, guilty as charged in the indictment.

ation, Inc. In addition to his employment, he had a contract, first oral, and then reduced to writing on June 1, 1941, whereby he agreed to keep the Aviation Company's plant clean of all debris and combustible material, including scrap lumber, dirty metal borings, waste material and scrap iron, as designated by North American Aviation, Inc. Any *acceptable material* found in the scrap bins was to be returned to the Aviation Company. The receipts from the sale of the waste material were to be divided as follows: 80 per cent to Anderson and 20 per cent to the Aviation Company. Anderson was required to furnish to the Aviation Company a complete itemized list at the end of each month, showing each sale, the buyer's name and a complete description of the material sold. The understanding was that only scrap, waste, materials, which could pass through the tines of a fork, introduced in evidence, would be deemed to be waste material. All others were considered salvage which was not to be taken, but was to be placed in a box in the department where found. If taken by mistake, it was to be returned. The method of operation of the defendants was as follows: Aimino was a laborer in the salvage division, one of a crew charged with gathering waste materials. By means of the fork, the waste was picked up and dumped into containers called "buggies", which were wheeled to the back of the building and hoisted into trucks owned and operated by Anderson. From the very beginning of the contract, Anderson paid Aimino weekly sums of money as compensation for placing sizeable pieces of the alloy, so important in the manufacture of airplanes, —dural—into the bottom of these buggies. In this manner, thousands of pounds of usable material found their way out of the aviation plant. Anderson caused these to be segregated by his own employees at a salvage yard, which he operated, and then sold them to a concern which defendant Sackett's father owned. Sackett was not a part of the original conspiracy, but joined it later by agreeing to give Anderson fictitious bills which showed only a portion of the material sold to his firm and resold to a foundry. Sackett pleaded nolo contendere, and was a witness for the Government.

In addition to the invoices showing the sales to the foundry of thousands of pounds of salvagable dural, there were found in Anderson's salvage yard, hundreds of pounds of clean rivets in barrels, which had clearly not been gathered as waste from the sweepings, but had been emptied into the barrels from sacks in which they were usually contained. Some sacked rivets were also found.

These facts, when added to those referred to in the opinion, constitute a complete summary of the evidence offered by the Government.

The defendants did not take the stand.